LOUIS A. LEONE, ESQ. (SBN: 099874)
KATHLEEN DARMAGNAC, ESQ. (SBN #150843)
**STUBBS & LEONE**
A Professional Corporation
2175 N. California Blvd., Suite 900
Walnut Creek, CA 94596
Telephone:    (925) 974-8600
Facsimile:    (925) 974-8601

**FILED**

E-filing    MAY  1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Attorney for Defendant CHABOT LA POSITAS COMMUNITY COLLEGE DISTRICT;
KATHERYN LINZMEYER; MELINDA MATSUDA; DR. ROBERT CARLSON; LORENZO
LEGASPI; ANITA MORRIS; SHARON TRETHAN

**BZ**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD FERREIRA

Case No.

Plaintiff,

vs.

**NOTICE OF REMOVAL OF ACTION UNDER
28 U.S.C. § 1441(b) & 1441(c) [FEDERAL
QUESTION]**

CHABOT COLLEGE; CHABOT- LAS
POSITAS COMMUNITY COLLEGE
DISTRICT; KATHERYN LINZMEYER;
MELINDA MATSUDA; DR. ROBERT
CARLSON; LORENZO LEGASPI; ANITA
MORRIS; SHARON TRETHAN AND
DOES 1-25,

Defendants.

TO PLAINTIFF RICHARD FERREIRA AND TO THE HONORABLE JUDGES OF THE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA:

Pursuant to 28 U.S.C. Sections 1331,1441(b) & 1441(c) and 1446, defendants

CHABOT LAS-POSITAS COMMUNITY COLLEGE DISTRICT (also erroneously sued herein

as CHABOT COLLEGE); KATHERYN LINZMEYER; MELINDA MATSUDA; DR. ROBERT

NOTICE OF REMOVAL

1  CARLSON; LORENZO LEGASPI; ANITA MORRIS; SHARON TRETHAN, in the action filed

2  in the Superior Court of the State of California in and for the County of Alameda, No. HG

3  07334984, styled "RICHARD FERREIRA V. CHABOT LAS POSITAS COMMUNITY

4  COLLEGE DISTRICT, et al.", hereby removes said action to the United States District Court

5  for the Northern District of California.

6    Please take further notice that a true copy of this Notice of Removal shall be filed with

7  the Clerk of the Superior Court of the State of California in and for the County of Alameda.

8    Removal is based on the following grounds:

9    1.  On or about April 1, 2008, plaintiff RICHARD A. FERREIRA ("plaintiff") served a

10 copy of a summons and plaintiff's Complaint for Damages ("Complaint") on defendant

11 CHABOT LAS POSITAS COMMUNITY COLLEGE DISTRICT in an action filed on July 11,

12 2007 in the Superior Court of the State of California, in and for the County of Alameda,

13 entitled "RICHARD A. FERREIRA v. CHABOT COLLEGE; CHABOT-LAS POSITAS

14 COMMUNITY COLLEGE DISTRICT; KATHERYN LINZMEYER; MELINDA MATSUDA; DR.

15 ROBERT CARLSON; LORENZO LEGASPI; ANITA MORRIS; SHARON TRETHAN and Does

16 1 through 25" (Case No. HG 07334984). A true and correct copy of the complaint and

17 summons, and civil cover sheet which constitutes all process and pleadings received by

18 removing defendants, are attached hereto as Exhibit A.

19   2.  Removing defendants filed an answer in Superior Court of the State of

20 California, in and for the County of Alameda, on April 28, 2008, no other paper or pleading

21 has been filed in this matter and this Notice of Removal is filed within thirty (30) days after

22 removing defendants received and became aware of plaintiff's complaint. Attached hereto

23 marked as Exhibit B is a true and correct copy of defendants' answer and proof of service.

24   3.  Plaintiff is alleged to be a former employee of defendant CHABOT LAS-

25 POSITAS COMMUNITY COLLEGE DISTRICT (hereinafter the "DISTRICT"). Plaintiff's

26 unverified complaint purports to assert several causes of action against the defendants,

27 arising out of the alleged discriminatory conduct that he claims occurred during his

28 employment with the DISTRICT- including the termination of his employment that is alleged

---

**NOTICE OF REMOVAL**

1   to have occurred on September 5, 2006 (Compl. ¶ 104). The complaint alleges (1) Sexual

2   Orientation Discrimination, Harassment & Retaliation - FEHA [**First Cause of Action**], (2)

3   Failure to Provide Reasonable Accommodations for Disabilities – FEHA [**Second Cause of**

4   **Action**] (3) Disability Discrimination, Harassment & Retaliation – FEHA [**Third Cause of**

5   **Action**], (4) Sex Discrimination, Harassment, Retaliation - FEHA [**Fourth Cause of Action**],

6   (5) Wrongful Termination – Due Process and Equal Protection [**Fifth Cause of Action**], (6)

7   Civil Rights Claim under 42 USC §1983 [**Sixth Cause of Action**], (7) Civil Rights Claim

8   under 42 USC §1985(3) [**Seventh Cause of Action**]; (8) Violation of Title IX (20 USC 1681 et

9   seq) [**Eighth Cause of Action**].

10        4.      This Court has original jurisdiction over this action and plaintiff's Complaint is

11  removable to this Court by defendants, and each of them, on federal question grounds *See*

12  (*Franchise Tax Bd. v. Construction Laborers Vacation Trust* (1983) 463 U.S. 1, 8-9. Plaintiff's

13  claims are based upon, and necessarily involve, construction and application of federal law

14  and the United States Constitution in that plaintiff claims to have suffered a violation of his

15  civil rights under federal constitutional law, the constitutional amendments, the equal

16  protection clause and 42 USC §1983. In addition, plaintiff claims his rights under Title IX,

17  Education Amendments of 1972, 20 U.S.C. §§1681, et seq. (see Compl. ¶¶ 172-180), have

18  been implicated and allegedly violated.

19        [T]he presence or absence of federal-question jurisdiction is governed by the
20        'well-pleaded complaint rule,' which provides that federal jurisdiction exists only
          when a federal question is presented on the face of the plaintiff's properly
21        pleaded complaint.

22  *(Rivet v. Regions Bank of Louisiana* (1998) 522 U.S. 470, 475 (quoting *Caterpillar, Inc.*

23  *v. Williams* (1987) 482 U.S. 386, 392 (internal quotation marks omitted); *see also, City*

24  *of Chicago v. International College of Surgeons* (1997) 522 US 156, 165). On its face,

25  plaintiff's complaint expressly alleges three independent and separate claims arising

26  solely under federal law (*see* 28 U.S.C. §1441(c)) in his Sixth Cause of Action (Compl.

27  ¶¶ 156-165), his Seventh Cause of Action (Compl.¶¶ 166-171) and his Eighth Cause

28  of Action (Compl. ¶¶172-180). Plaintiff alleges violations of 42 USC §1983, 42 USC

---

NOTICE OF REMOVAL

§1985(3), the first, fourth, fifth, ninth, thirteenth and fourteenth amendments to the U.S.

Constitution, and Title IX, Education Amendments of 1972, 20 U.S.C. §§1681, et seq..

Plaintiff's complaint states, in pertinent part,

> The acts of discrimination, harassment, retaliation, and creation of an ongoing
> hostile work environment set forth herein which were committed against Plaintiff
> violated his Constitutional Rights to be secure in his person, his right to free
> speech, movement, association and assembly, his right to privacy, his right to
> be free from unreasonable search and seizures, to be free from involuntary
> servitude, and his rights to due processes of law before being deprived of liberty
> or property, his right to petition his government for redress of grievances, and to
> be free fro employment discrimination based on his sex and/or sexual
> orientation and /or his mental disability, all in violation of the first, fourth, fifth,
> ninth, thirteenth, and fourteenth amendments to the U.S. Constitution and of 42
> USC §1983.
>
> …
> CHABOT receives federal financial assistance for its public education
> programs.  Defendants' ratification of conduct and failure to respond to
> Plaintiffs' complaints or to stop such harassment despite their duty to do so and
> despite Plaintiffs' request and pleas, created an intimidating, hostile, offensive,
> and abusive school environment in violation of Title IX of the Education
> Amendments of 1972, 20 U.S.C. §1681 et seq.

(Compl. ¶¶ 160, 173)).

5.    Removal is proper even though plaintiff's complaint combines other state claims

along with plaintiff's federal claims.  Pursuant to 28 U.S.C. § 1367(a), federal courts have

supplemental jurisdiction to adjudicate state claims that are transactionally related to the

federal claim (*City of Chicago v. International College of Surgeons, supra,* 522 US at 165).

Supplemental jurisdiction is proper where the relationship between the federal and state

claims is such that the claims "form part of the same case or controversy under Article III of

the United States Constitution" (28 U.S.C. § 1367(a)).  No other basis for federal jurisdiction

is required (see also Danner v. Himmelfarb (9th Cir. 1988) 858 F.2d 515, 521-522, cert.

denied sub. nom Davis v. Himmelfarb (1989) 490 U.S. 1067).  Here, plaintiff's complaint

allegations make it plain that the identical alleged facts and circumstances purportedly giving

rise to her state claims [First through Fifth Causes of Action] are also alleged to give rise to federally preempted claims (Compl. ¶¶105-155).

6.    The joinder of claims based on state law does not defeat removal jurisdiction. 28 U.S.C. §1441(c) provides:

> Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates.

7.    Fewer than thirty (30) days have elapsed since defendants learned of and received a copy of plaintiff's Complaint such that this matter became removable to this Court (28 U.S.C. § 1446(b)).

8.    This Notice of Removal is signed by counsel for removing defendants pursuant to Rule 11 of the Federal Rules of Civil Procedure.

WHEREFORE, Defendants, and each of them, respectfully requests that this action be removed to this Court.

Dated:  April $\cancel{3}$0, 2008          **STUBBS & LEONE**

By: _____

KATHLEEN DARMAGNAC, ESQ.
Attorney for Defendants CHABOT LAS POSITAS COMMUNITY COLLEGE DISTRICT; KATHERYN LINZMEYER; MELINDA MATSUDA; DR. ROBERT CARLSON; LORENZO LEGASPI; ANITA MORRIS; SHARON TRETHAN

---

**NOTICE OF REMOVAL**

**Exhibit A**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| RICHARD A. FERRE~~TT~~ , In Pro Per<br>18~~14~~9 Robscott Avenue<br>Hayward, CA 94541<br><br>TELEPHONE NO.: (510) 706-5118    FAX NO.:<br>ATTORNEY FOR (Name): | ENDORSED<br>FILED<br>ALAMEDA COUNTY<br><br>JUL 1 1 2007<br><br>CLERK OF THE SUPERIOR COURT<br>By ~~MEL~~ DHILLON, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ~~Alameda~~ HAYWARD HALL
STREET ADDRESS: ~~1225 Fallon Street, Room 209~~ OF JUSTICE
MAILING ADDRESS: 24405 AMADOR ST.
CITY AND ZIP CODE: ~~Oakland, CA 94612~~ HAYWARD, CA 94544
BRANCH NAME: ~~RENE C. DAVIDSON COURTHOUSE~~

CASE NAME: 151: SHORT TITLE OF CASE

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: HG 07334984 |
|---|---|---|
| ☒ Unlimited  ☐ Limited<br>(Amount        (Amount<br>demanded      demanded is<br>exceeds $25,000)  $25,000 or less) | ☐ Counter  ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br><br>DEPT.: |

*Items 1-5 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☒ Wrongful termination (36)
☒ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is  ☒ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Type of remedies sought (check all that apply):
   a. ☒ monetary  b. ☒ nonmonetary; declaratory or injunctive relief  c. ☐ punitive

4. Number of causes of action (specify): 16

5. This case ☐ is  ☒ is not  a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date:

Richard A. Ferreira, In Pro Per
(TYPE OR PRINT NAME)                    ▶    _____
                                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2007]    Martin Dean's ESSENTIAL FORMS™    CIVIL CASE COVER SHEET    Cal. Rules of Court, rules 3.220, 3.400-3.403;
Standards of Judicial Administration, § 19
www.courtinfo.ca.gov

1: SAMPLE CLIENT

CM-010

**To Plaintiffs and Others Filing '*ST*_TIONS ON HOW TO COMPLETE THE COVER SHE'**
**Papers**

If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 5 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the *primary* cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. You do not need to submit a cover sheet with amended papers. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Complex Cases**

In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)-Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*
**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice-Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach-Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case-Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ-Administrative Mandamus
  Writ-Mandamus on Limited Court Case Matter
  Writ-Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal-Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400-3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late Claim
  Other Civil Petition

CM-010 (Rev. January 1, 2007)    **CIVIL CASE COVER SHEET**    Page 2 of 2

Martin Dean's ESSENTIAL FORMS™

1: SAMPLE CLIENT

1   RICHARD A. FERREIRA
    18349 Robscott Avenue
2   Hayward, CA 94541
    Telephone: (510) 706-5118
3
    In Pro Per
4

ENDORSED
FILED
ALAMEDA COUNTY

JUL 11 2007

CLERK OF THE SUPERIOR COURT
By MEL DHILLON , Deputy

5       IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
        IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| 6  RICHARD A. FERREIRA, | Case No.: HG 07334984 |
| 7      Plaintiff, | **COMPLAINT FOR DAMAGES** (Unlimited Jurisdiction) |
| 8      vs. | 1.   Sexual Orientation Discrimination, Harassment & Retaliation - FEHA |
| 9  CHABOT COLLEGE; CHABOT-LAS POSITAS | 2.   Failure to Provide Reasonable Accommodations for Disabilities - FEHA |
| 10  COMMUNITY COLLEGE DISTRICT; KATHERYN | 3    Disability Discrimination, Harassment & Retaliation - FEHA |
| 11  LINZMEYER; MELINDA MATSUDA;  DR. ROBERT | 4    Sex Discrimination, Harassment, Retaliation - FEHA |
| 12  CARLSON; LORENZO LEGASPI; ANITA MORRIS; | 5    Wrongful Termination  -  Due Process and Equal Protection |
| 13  SHARON TRETHAN; | 6    Civil Rights Claim under 42 USC §1983 |
| 14  and DOES 1-25, | 7    Civil Rights Claim under 42 Usc §1985(3) |
|        | 8    Violation of Title IX (20 USC 1681 et seq.) |
| 15      Defendants. | **JURY TRIAL DEMANDED** |

        Plaintiff RICHARD A. FERREIRA (hereafter "RICHARD") for his complaint against

Defendant CHABOT COLLEGE and DOES 1-25, inclusive, hereafter sometimes collectively

referred to as "Defendants," alleges as follows:

## INTRODUCTION

    1.      RICHARD A. FERREIRA ("Richard"),  a former employee with CHABOT

COLLEGE and CHABOT-LAS POSITAS COMMUNITY COLLEGE DISTRICT brings this

1    action to vindicate his statutory, constitutional and common law rights.

2        2.    Said illegal employment practices, as set forth herein and as subject to proof, have

3    caused and will continue to cause Mr. FERREIRA to suffer damages, injuries and losses,

4    including, but not limited to, loss of earnings, costs of legal actions and attorneys fees, mental

5    and emotional pain, humiliation, mental anguish, loss of enjoyment of life, and emotional

6    distress.

7                                              **PARTIES**

8        3.    Mr. FERREIRA worked for CHABOT COLLEGE, CHABOT-LAS POSITAS

9    COMMUNITY COLLEGE DISTRICT and related entities for approximately nine years.  He was

10   terminated in September of 2006.  Mr. FERREIRA's sexual orientation is homosexual, but

11   initially sought to keep his sexual orientation private until forced to reveal it by Defendants;

12   nonetheless at all times herein Defendants either knew RICHARD was homosexual or perceived

13   that he was.    RICHARD is, and since 1988 has been, diagnosed with bipolar disorder, a serious

14   mental health condition and mental disability which is subject to relapses, especially when

15   RICHARD is subject to severe stress.  This bipolar disorder limits, and significantly limits

16   multiple major life activities of RICHARD, including, sleep, work, eating, and social activities,

17   as do the side effects of the medication RICHARD must take to treat and mitigate the bipolar

18   condition.  Furthermore, at all times since 2001, Defendants and each of their managers and

19   supervisors knew of RICHARD'S bipolar condition and/or perceived that he was bipolar.

20       4.    CHABOT COLLEGE is a public community college located in Hayward,

21   California, and is part of the CHABOT-LAS POSITAS COMMUNITY COLLEGE DISTRICT,

22   and a governmental body.   Said defendants are governmental bodies, and the alter ego of each

23   other and/or subsidiary, and the same entity, and are collectively referred herein as "CHABOT"

24   or "CHABOT COLLEGE" or 'THE CHABOT DEFENDANTS."  Each of these defendants are

25   employers within the meaning of California Government Code section 12926(d) and

26   12940(j)(4)(A) (formerly section 12940(h)(3)(A)) and, as such, are barred from discriminating in

27   employment on the basis of sex, sexual orientation or disability or harassing employees on the

28

---

**COMPLAINT FOR DAMAGES**

2

1  basis of sex, sexual orientation, or disability as set forth in Government Code section 12940, *et*
2  *seq.* and each are required to provide reasonable accommodations to employees with disabilities.

3       5.     The following natural persons named as defendants in this complaint, without
4  limitation, are "supervisors" of CHABOT , as defined by Gov. Code 12940: Katheryn
5  Linzmeyer (DIR) , Melinda Matsuda (VP), Dr. Robert Carlson,  President; Lorenzo Legaspi
6  Vice Chancellor, Anita Morris, Human Resources  Director, Sharon Trethan, Human Resources
7  Director.

8       6.     At all times herein mentioned, each of the defendants were the agents, servants
9  and employees of each of the remaining defendants herein, and were at all times acting within
10  the purpose and scope of said agency and employment, and that the acts of each agent, servant
11  and employee have been ratified by each of the remaining defendants. Further, that at all times
12  relevant hereto each and every defendant  knew, or should have known, that each other defendant
13  was unqualified for hiring, and knew, or should have known, that hiring each other defendant
14  would create  a foreseeable risk of injury to others, including plaintiff, and that with said
15  knowledge, each defendant did negligently and carelessly hire each other defendant to act as their
16  agent, servant and employee. Further, that at all times relevant hereto each and every defendant
17  knew, or should have known, that each other defendant so hired required close supervision, and
18  knew, or should have known, that failing to closely  supervise each other defendant would create
19  a foreseeable risk of injury to others, including plaintiff, and that with said knowledge, each
20  defendant did negligently and carelessly fail to closely supervise each other defendant in the
21  course and scope of their agency and employ. Each and every act, and omission to act, as alleged
22  in this paragraph caused injury to plaintiff, as further alleged herein.

23                                       **PROCEDURAL HISTORY**

24       7.     On July 11, 2006, Plaintiff filed a charge of discrimination with the California
25  Department of Fair Employment and Housing ["DFEH"] and was an issued right to sue letter.
26  Plaintiff has timely filed this suit in accord with said right to sue letter.

27                                    **JURISDICTION AND VENUE**

28

                                  COMPLAINT FOR DAMAGES

1     8.   · This Court has jurisdiction and venue of the subject matter of PLAINTIFF's

2   claims. Defendant CHABOT COLLEGE is a public educational institution whose principle

3   place of business and headquarters is located in Hayward, Alameda County, California;

4   Defendant CHABOT-LAS POSITAS COMMUNITY COLLEGE DISTRICT is a public

5   educational institution whose principle place of business and headquarters is located in

6   Pleasanton, Alameda County, California, and all of the wrongful conduct alleged herein occurred

7   within Alameda County.

8     9.    Mr. FERREIRA was employed by DEFENDANT at all times the unlawful

9   practices herein alleged occurred.

10              **DOE DEFENDANTS**

11     10.    Mr. FERREIRA is ignorant of the true names and capacities, whether individual,

12   corporate, associate, or otherwise of DEFENDANT Does 1 through 50 inclusive and therefore

13   sues these defendants by such fictitious names. Mr. FERREIRA will amend his complaint to

14   allege their true names and capacities when this has been ascertained.

15             **RESPONDEAT SUPERIOR**

16     11.    All of the described conduct, acts, and failures to act are attributed to agents and

17   employees under the direction and control, and with the permission, consent and authorization of

18   Defendant. Said acts, conduct and failures to act were within the scope of such agency and/or

19   employment, and each defendant ratified the acts and omissions of each of the other defendants.

20   Each of these acts and failures to act is alleged against each defendant whether acting

21   individually, jointly, or severally. At all times relevant herein, each defendant was acting within

22   the course and scope of his or her employment.

23     12.    Defendant is responsible for the actions, policies and practices of its agents and

24   employees. At all relevant times, Defendant was and continues to be responsible for assuring

25   that the actions of its agents and employees comply with the United States and California

26   Constitutions, federal and state civil rights laws, other statutes and common law.

27          **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

28

1       13.    Before invoking the jurisdiction of this Court, Mr. FERREIRA timely filed a

2  complaint with the California Department of Fair Employment and Housing ["DFEH"] and

3  received a right to sue notice for each of his causes of action alleged under the California Fair

4  Employment and Housing Act ["FEHA"], and has commenced this action in a timely manner.

5

6               **WORKERS COMPENSATION EXCLUSIVITY DOES NOT APPLY**

7       14.    Each and every wrongful, injurious, negligent, willful, discriminatory, harassing

8  act, and failure to act, by the Defendant,  were not a normal incident of employment and were

9  outside the scope of the employment bargain. Thus, the Worker's Compensation exclusive

10  remedy set forth in California Labor Code §3600 et seq. will not bar recovery for damages set

11  forth herein.

12                       **STATEMENT OF FACTS**

13       15.    Beginning in January, 2001, co-worker Jim Sullivan began sexually plaintiff

14  harassing at work with repeated and unwelcome propositions, advances, teasing and flirting,

15  offers for drinks, lunch or dinner dates, imposing sexually graphic pictorials on plaintiff, sexually

16  graphic animations, sexual comments.   When Plaintiff rejected these advances, Sullivan

17  retaliated by making slanderous and untrue comments in the office denigrating plaintiff's work

18  performance.   Plaintiff's last performance review prior to this sexual harassment was favorable.

19       16.    In late May, 2001, Sullivan approached, harassed and sexually assaulted plaintiff

20  in a local tavern  off- campus. Sullivan made sexual comments to plaintiff and told Plaintiff in

21  graphic detail sexual acts Sullivan wanted to perform with plaintiff.   Richard rejected his

22  comments, when he attempted to back away, Sullivan reached around behind Richard and

23  forcefully placed him into a hold by grabbing and holding his buttocks from behind, and made

24  more extremely sexually explicit intimidating comments regarding Richard's backside and

25  demanded sex. Richard had to forcefully push  Jim Sullivan away.  Richard did not immediately

26  disclose the incident to anyone at work because the Financial Aid Office Director was resigning

27  and Richard was afraid to discuss the matter with anyone else at first.  Sullivan increased his

28

1   sexual harassment of Richard in the office thereafter.

2       17.    On or about June 18 and June 18, 2001 Richard requested a meeting with Vice
3   President Melinda Matsuda so he could discuss Sullivan's harassment with her.  When he met
4   with her on June 20, 2001, he was not allowed to pursue his complaints of sexual harassment.
5   Instead, Matsuda invited Trish Brown and Ruben Hernandez and began the meeting by making
6   unfounded criticisms of Richard's work.  Matsuda immediately handed Richard a written memo
7   falsely reprimanding his performance, and Matsuda repeatedly attempted to force Richard to sign
8   the negative performance memo, which  Richard refused.  Richard repeatedly request a private
9   meeting with Matsuda so he could discuss Sullivan's harassment.

10      18.    In a subsequent private meeting with Matsuda Richard told her he was being
11  harassed without going into specifics and requested that he be given the opportunity to provide
12  proof.  Matsuda stated that Michael McPartlin had informed her of Richard's medical condition
13  since he was resigning and Richard confirmed to her he was bipolar.

14      19.    On or about  June 26, 2001, Matsuda summoned Richard to another meeting with
15  Matsuda and supervisors Trish Brown and Ruben Hernandez, and again, Matsuda again
16  requested that Richard sign the negative performance  memo which Richard again declined.
17  Plaintiff is informed and believes the negative review was based on Sullivan's false derogations
18  of Richard and Richard's work performance.  Also, at this group meeting Matsuda pressured
19  Richard to reveal his medical condition, bipolar syndrome and insisted the  only way she could
20  improve on the communication in the office was for  Richard to agree to allow her to disclose his
21  medical condition to co-workers.  Matsuda further denigrated Richard's complaints of
22  harassment by Sullivan, falsely attributing them to Richard's medical condition.  Richard initially
23  refused and protested that it would be incorrect and inappropriate.  Matsuda persisted and
24  pressured Richard's consent to disclose his condition to his co-workers.  Matsuda then revealed
25  Richard's medical condition to the classified staff .

26      20.    After this group meeting, Richard insisted Matsuda meet with him privately.
27  When they met privately, Matsuda began by again pressuring Richard to sign the falsely critical

28

1    performance memo, fraudulently representing that if signed it, she would not place it in Richard's
2    personnel file but instead would maintain it in a separate file in her office. Richard refused and
3    then told Matsuda in detail about Sullivan's ongoing sexual harassment, and informed Matsuda
4    he had documented that Sullivan was the source of the false reports of Richard's poor work
5    performance. Richard complained that Matsuda was not handling his concerns fairly, and told
6    her he was upset that she force him to agree to disclose his medical condition to the office staff
7    when this matter had to do with sexual harassment and not his medical condition. Richard was
8    so upset that he discussed the option of resigning and requested a transfer out of the Financial
9    Aid Office in the alternative, and told Matsuda that the additional stress of being harassed was
10   also exacerbating his medical condition. Matsuda instructed Richard not to file a formal
11   complaint, and that instead, she would conduct an informal investigation. Richard agreed to
12   provide Melinda Matsuda documentation regarding his sexual harassment complaint and with no
13   one else.

14        21.    Richard detailed these incidents of sexual harassment incidents, including names
15   of witnesses for Matsuda. However, Matsuda would not make herself available to discuss his
16   complaints of harassment. Sullivan's sexual harass increased unabated, and no action was taken
17   by management. Richard documented Jim Sullivan continual complaints to Trish Brown, and
18   insisted on a meeting with Matsuda to address Sullivan's harassment. On August 20, 2001
19   Richard told Matsuda at a brief informal encounter that he had documented how Jim Sullivan
20   was creating a hostile working environment because of his past rebuffing of advances and that
21   something needed to be done. Matsuda again said she would get back with him and schedule a
22   time to meet, but did not. On August 23, 2001, Sullivan made the work environment extremely
23   hostile by ridiculing and laughing at Richard in the hallway when Richard was leaving to go
24   home ill. Richard, in an uncontrollably distraught state, reluctantly went to Matsuda's office and
25   insisted that management take action. When Richard stated he would he would file a formal
26   complaint in order to get management to intervene, Matsuda discouraged him, saying that Chabot
27   College could not be held responsible for what happened "off campus." Matsuda said she would
28

**COMPLAINT FOR DAMAGES**

1   conduct an investigation if Richard provided her a written complaint. Matsuda finally questioned
2   Richard about Sullivan's harassment and past events, and confronted Richard about his sexual
3   orientation and asked him if he knew what Jim's orientation, stating that it was needed to
4   establish a basis for her investigation. This further traumatized Richard, because he had not
5   previously disclosed it to anyone at Chabot College and did not want to. Richard reluctantly
6   disclosed he was gay and stated he understood Sullivan to be bisexual. Richard made explicitly
7   clear that Sullivan's sexual advances, verbal and physical harassment were unwelcome and
8   distressing to Richard, and rebuffed by Richard. Richard also told Matsuda that he had been
9   rebuffing Sullivan's advances from the time his employment began in the Financial Aid Office.
10   Matsuda instructed Richard to file a written complaint.

11       22.     On September 4, 2001 Richard delivered a formal written complaint to Matsuda's
12   assistant in her absence. Matsuda and Trish Brown met with Richard and Matusda said she
13   would look into the matter and resolve it quickly.

14       23.     Matsuda met with Richard later that day at 7:00pm and informed Richard that
15   she conducted an initial investigation and spoke to Jim Sullivan. Matsuda stated Sullivan denied
16   any wrongdoing and any interest in sexual relations with men (that he was heterosexual), and that
17   Sullivan stated he wanted to file complaint against Richard and threatened to sue Chabot College
18   for the slanderous comments Richard made against him if his complaint was filed. Richard
19   stated that he had no interest in Jim Sullivan whatsoever, and reiterated the truth of his
20   complaints about Sullivan, and offered to provide poof to support his complaint and further proof
21   of Sullivan's sexual assault off campus. In the confines of this confidential meeting ostensibly
22   to investigate Richard's complaints, Richard reported that he had heard from other sources
23   regarding Sullivan's sexual orientation. "Jim Sullivan is living together or having sex with an old
24   woman who financially takes care of him, but that Jim also has sex with men on the side".
25   Matsuda immediately became visibly angry, and repeated that Chabot College would not be held
26   responsible for what happens "off campus". Richard also reported Sullivan frequently used the
27   computer to show him sexual images, sexual innuendos, sexual invitations, dinner invitations,
28

COMPLAINT FOR DAMAGES

8

1   and invitations to have a drink with him. Richard reported that after the Sullivan sexually

2   assaulted him on or about on May 25, Jim reverted to bullying him to the point where it was

3   intolerable to work in the Financial Aid Office , and that after Richard rejected Sullivan's sexual

4   advances, Sullivan retaliated by complaining about Richard's work performance to his

5   supervisors.

6       24.    Matsuda for the first time provided Richard with a form titled "Complaint of

7   Alleged Unlawful Discrimination of Sexual Harassment" and told him he needed to complete it

8   for her to conduct the investigation formally. This meeting Richard also told Matsuda that

9   Sullivan grabbed Richard's arm and pulled him out of the office on or about the morning of

10  August 16, 2001 and threatened Richard that he had better not complain anymore to

11  management because they were not going to help him, and that he could smell alcohol on

12  Sullivan's breath at work, which further frightened Richard. Matsuda listened to his complaint

13  and did not provide any assurances.

14      25.    Matsuda then demanded Richard agree that he had not asked for any medical

15  accommodation previously which Richard refused and pointed out that in a previous meeting

16  (June 26, 2001) he requested a transfer out of the Financial Aid Office because the additional

17  levels of stress caused by this harassment aggravated his bipolar medical condition. Richard also

18  reminded her his was not approved and there was no follow-up about this request for his medical

19  condition afterwards.

20      26.    Lastly, Matsuda repetitively admonished Richard to not file the written complaint

21  against Sullivan and warned him that he was "turning a mole hill into a mountain" and that she

22  was "trying to save you from any embarrassment because Jim Sullivan stated he was a

23  heterosexual and not interested in men in any way". These admonishments by Matsuda

24  confirmed that Sullivan's threats that management would not help him. Richard refused to

25  withdraw his complaint, and insisted that something had to be done and that Matsuda accept the

26  written complaint. Matsuda then questioned Richard, whether "your mental condition was

27  effecting your judgment?" Richard could no longer believe what he was hearing. Richard again

28

COMPLAINT FOR DAMAGES

1  assured Matsuda that his statements of the events were factual and offered to provide proof,

2  including witnesses, and witness who could attest to Sullivan's true sexual orientation. Richard

3  then requested this second meeting to be adjourned.

4      27.    On September 10, 2001 Richard emailed Sharon Trethan, Human Resources

5  Director, that Matsuda was biased against his complaints, and that Matsuda had created

6  additional barriers to prevent Richard from filing his the complaint, such as insisting the form

7  must be completely filled out before she could conduct the investigation.  At this point, Richard

8  filed the complaint with Human Resources in the hope that management would finally take

9  action.

10      28.    Matsuda's failure  to conduct an inquiry or to allow Richard to respond unless he

11  signed off on the false negative performance concern memo, Matsuda's disparaging

12  characterization of Richard's complaint of sexual harassment as a symptom of his medical

13  condition and/or being related to criticisms of his work performance, her failure to conduct an

14  impartial investigation of his complaints of sexual harassment , her repeated and persistent

15  requests for Richard to sign a negative performance evaluation without conducting any

16  investigation, her coercive tactics to attempt to force Richard to sign the false performance

17  concern memo, her coercion to get him to assent to disclose his medical condition to his peers

18  and supervisors, her insistence he withdraw his sexual harassment complaint to avoid any

19  embarrassment, her violating of his employment privacy rights by asking his sexual orientation

20  during a meeting under the guise that it was necessary for the complaint investigation, her failure

21  to provide any reassurances that there was a no tolerance policy for sexual harassment in the

22  office, her failure take action to prevent any further harassment from occurring in the future, were

23  all motivated, in part, in retaliation for Richard complaining of Sullivan's sexual harassment and

24  for telling Matsuda as part of his bona fide complaint about Sullivan that it was rumored that

25  "Jim Sullivan is living together or having sex with an old woman who financially takes care of

26  him, but that Jim also has sex with men on the side".

27      29.    On September 10, 2001, Matsuda's emailed Richard that the investigation was

28

**COMPLAINT FOR DAMAGES**

1 reassigned to Marge Maloney, Interim Vice President of Academic Services, and that he was to
2 be transferred to the Student Online Center on a temporary basis.

3     30.    On September 17, 2001 Richard was reassigned to work in Student Online
4 Services and Sullivan remained in the Financial Aid Office.   Richard on this day hand delivered
5 a copy of the sexual harassment complaint to Marge Maloney as instructed.   Matsuda claimed
6 that the sexual harassment complaint investigation was postponed due to the terrorist attacks on
7 September 11, 2001.  No investigation was ever  completed by Marge Maloney and Richard
8 never received a response from management in writing about its supposed investigation.

9     31.    On January 29, 2002 Matsuda informed Richard in a meeting that she was
10 working to maintain things the way they were (meaning Richard and Sullivan work in different
11 departments in the same building) since there appeared to be no further concerns.  Matsuda said
12 that her goal was to resolve the situation when a Director of Financial Aid was hired.  Matsuda
13 asked that Richard be patient and agree to keep things the way they were and Richard agreed. By
14 this time, Marge Maloney no longer held the position of Interim Vice President of Academic
15 Services.  Matsuda also said that the new Director of Financial Aid, when hired, would conduct
16 the sexual harassment investigation instead of Marge Maloney.

17     32.    On April 1, 2002, Kathy Linzmeyer, the new Financial Aid Director, conducted an
18 interview to discuss Richard's job and performance.  Kathy Linzmeyer did not investigate any of
19 Richards' sexual harassment allegations.  Instead, Linzmeyer limited her question to whether
20 Richard filed a formal sexual harassment complaint, which Richard affirmed he had.  Richard
21 provided Linzmeyer with a copy of the complaint with the understanding that she would conduct
22 the investigation and said that Matsuda, Sharon Trethan, and Marge Maloney were informed and
23 given copies, and that Matsuda told him that Linzmeyer would hereinafter handle the
24 investigation.  Linzmeyer said she would have to look into the matter and did not address it again
25 with Richard.

26     33.    On May 13, 2002, Matsuda told Richard informally that she would be address his
27 performance evaluation soon and said told Richard that management was placing him
28

COMPLAINT FOR DAMAGES

11

1  permanently in the Student Online Services to resolve any "concerns" after his meeting with

2  Kathy Linzmeyer. Matsuda did not address the sexual harassment complaint.  On May 15, 2002

3  Linzmeyer discussed the new job description with Richard for Student Online Services as his

4  permanent position.

5      34.     On May 30, 2002 Matsuda completed an annual performance review form,

6  however, the document stated period ending May 1, 2001 (one year prior) and was incomplete on

7  the front page.  Matsuda asked that Richard ONLY sign the form and said she would it should

8  have been done a long time ago.  Richard read the review which falsely stated that Michael

9  McPartlin completed his first annual evaluation back in 2001 before he left.  Richard offered

10  Matsuda a copy of his first annual performance review, which she declined, and quickly changed

11  her story.  Matsuda now said that if one was completed for the first year that this review could be

12  used as the annual performance evaluation for the current year for the period ending in 2002.

13  However, Richard's annual review anniversary date was not until July.  Richard said that

14  Michael McPartlin completed Richard's annual performance review early because he was

15  resigning.  Richard cooperated and signed the document.  However, he dated it for the current

16  date of May 30, 2002 and insisted that before Matsuda left that he make a copy of it for his

17  records.

18      35.     On June 11, 2002, however, Matsuda and Linzmeyer told Richard there would be

19  no permanent position, allegedly due to budget constraints. Matsuda told Richard he would have

20  to return to the Financial Aid Office, which would force him to work directly with Sullivan.

21  Richard asked them how they intended to resolved his sexual harassment complaint when he

22  returned. Matsuda replied, "What I have so far is speculative.... and there was no basis to

23  establish sexual harassment." Richard replied that there had not been an investigation and he

24  was not asked or allowed to provide his proof of harassment, and that Matsuda could not have

25  concluded the investigation as it was assigned to Linzmeyer, and that Linzmeyer had not

26  conducted any investigation. Richard repeated his question how management intended to resolve

27  the unacceptable working condition of being forced to work with someone who sexually

28

**COMPLAINT FOR DAMAGES**

12

1    assaulted him?  Linzmeyer retorted, "You need to drop this…There's no proof….. You two will
2    have to learn to work together." Richard said, "You did not complete an investigation and I will
3    not work with someone who sexually assaulted me." Richard then informed both of them that he
4    was too upset to discuss the matter further at this time.

5         36.    On June 12, 2002, Richard was forced to take an extended medical absence
6    through June 28, 2002 because the stress from the June 11 meeting, and the stress of having to
7    return to working in the Financial Aid Jim Sullivan  caused a relapse of his bipolar medical
8    condition.  His psychiatrist, Dr. Weiss,  wrote a note to CHABOT on June 12 stating that he was
9    treating Richard for bipolar disorder, that stressful situations can precipitate episodes and that,
10   specifically the stress of working in the Financial Aid department could trigger an episode.
11   CHABOT received this note on or shortly after June 12.

12        37.    On June 17, 2002 Richard again requested a written medical accommodation, had
13   his request was hand delivered to Dr. Robert Carlson, acting President in Matsuda's absence
14   along with the June 12 note from Dr. Weiss. The request was for Richard to remain in the
15   Student Online Services as an accommodation for his bipolar medical condition which was
16   severely exacerbated by the undue stress created by management forcing Richard to work with
17   Sullivan.  On June 19, 2002, Dr. Carlson denied the request within four hours of receiving it,
18   without engaging in any interactive process or discussions with Richard.

19        38.    On June 25, 2002 management further retaliated when Linzmeyer reprimanded
20   Richard regarding his performance stating it was due to unexplained absences.  Linzmeyer
21   violated Richard bonafide medical condition rights under ADA and FEHA and stated that his
22   absences reflected negative performance in a letter referred to as "First Written Warning."  The
23   reprimand was mailed prior to Richard's return to the Financial Aid Office and received certified
24   mail.

25        39.    On July 1, 2002, Linzmeyer summoned Richard to a meeting to discuss his
26   reprimand and to confirm that he received it.  Richard told her that management (namely
27   Linzmeyer, Matsuda and Dr. Robert Carlson) violated his rights as a person with a disability
28

**COMPLAINT FOR DAMAGES**

13

1    under the ADA and FEHA, and that management (including Matsuda, Linzmeyer, Sharon
2    Trethan and Marge Maloney) failed to conduct an investigation regarding his sexual harassment
3    complaint. Richard also complained to Linzmeyer that management violated his rights when she
4    reprimanded him on his absences based on his medical condition and Dr. Carlson and Matsuda
5    denied his request without any interactive process. Linzmeyer then became very angry and
6    verbally abusive and resorted to name calling, and declared that she would "not tolerate any more
7    of this." Linzmeyer then regained her composure and accused Richard of being insubordinate
8    and fabricating any excuse to not work in the Financial Aid Office and to make upper
9    management approve his request. Linzmeyer said she did not believe that (Richard) "really had
10   any real medical sickness." She intimated Richard by asking if he liked his job, and when he
11   replied yes, she threatened him to "drop the whole thing if you want to keep it". Kathy further
12   said that she could have already fired him for not calling in to "her" during his "unexcused"
13   absences per the letter. Richard stated that he called had his absences in until his doctor's note
14   was received and given to management [on June 12], as instructed and that management denied
15   his medical accommodations. Linzmeyer then became extremely angry again and warned
16   Richard to listen to her instructions carefully and said that, "For the record....there was no
17   medical accommodation requests on file made to Carlson...you got that...no
18   accommodation...and you have no medical accommodation listed on your application with
19   Chabot so we can fire you for lying on your employment application". Linzmeyer further
20   threatened Richard, "you better forget the whole thing if you know what's good for you".
21   Richard asked Linzmeyer to remove the warning from his file. Linzmeyer regained her
22   composure again and said that, "your 'First Written Warning' would not be destroyed and that
23   was final and that you will not be treated differently than anyone else and was expected to
24   maintain the same performance standards from now on". Richard protested that management
25   was forcing him to work with Jim Sullivan again in the same office whereupon Linzmeyer
26   dismissed him.
27       40.    On July 11, 2002 Kathy Linzmeyer then sent an email to the office that Sullivan
28

**COMPLAINT FOR DAMAGES**

14

1 was transferred to Admissions and Records Office effective August 1, 2002. Linzmeyer failed to
2 investigate the sexual harassment complaint, and did not provided a conclusion to the allegations.
3 Richard was forced to work with Sullivan in the same office and in close proximity until August
4 1, 2002.

5     41.    Linzmeyer and Matsuda failed and refused to conduct Richard's performance
6 review in July, 2003 as required.

7     42.    On September 26, 2002 Sullivant continued his harassment of Richard by leaving
8 a derogatory note on Richard's computer. Richard reported this to Linzmeyer that day in an
9 email. Richard followed up with written complaint in December that the harassment was
10 continuing. Another employee admitted to being involved in the incident, but management
11 would not consider Sullivan's involvement despite a witness statement Richard obtained
12 indicating that Sullivan was also likely involved.

13     43.    Richard took another medical leave of absence from September 27, 2002 to
14 October 14, 2002 due to the stress of working around Sullivan again and his taunting message
15 which went unaddressed by management.

16     44.    On October 10, 2002 a medical note was provided from Richard's physician to
17 Matsuda documenting Richard's disability and stating the additional stress related to the
18 harassment was exacerbating his medical condition when Richard returned to the Financial Aid
19 Office.

20     45.    On November 14, 2002, Linzmeyer retaliated by a written letter addendum to
21 Richard that the "First Written Warning" letter regarding absences dated June 25, 2002 warning
22 was now going to be placed in his permanent personnel file.

23     46.    On November 22, 2002, Linzmeyer confronted Richard at his desk and
24 told him he was to stop using excel spreadsheets to assist him in reviewing application files.
25 Richard replied he could not understand they would not allow him to utilize these resources
26 available to complete his work effectively and efficiently. Richard asked management to address
27 this concern later in a private meeting and possibly consider his request as a medical
28

COMPLAINT FOR DAMAGES

15

1  accommodation if needed. Linzmeyer replied falsely that he had no medical condition on file
2  and that she had no knowledge of any medical condition under ADA. Richard insisted that
3  Linzmeyer discussed his medical condition in private and not at his desk. The meeting continued
4  in Linzmeyer's office where Richard stated for the record that he had previously provided
5  written requests for accommodations and that management denied each of them. Richard stated
6  that in previous positions held at Chabot he was able to complete the work without
7  accommodation but that the sexual harassment negatively affected his ability to perform the
8  work, and that previously he had completed each of his jobs using a similar system and there
9  were no concerns raised. Linzmeyer repeated her false assertion that Chabot did not have a
10 medical condition on file because there was no disclosure or request(s) for accommodation on his
11 application for the college. Linzmeyer informed Richard that if he wanted a medical
12 accommodation he would have to follow "formal procedures" because there was nothing on file.
13 Richard followed Linzmeyer's instructions and stopped using the excel program to assist him in
14 documenting the review of his processing files and completed it manually. Richard requested
15 that Linzmeyer provide him with a copy of a written processing policies and procedures since he
16 would no longer be allowed to use the excel program. Linzmeyer gave Richard a written file
17 processing training manual. Richard continued using excel to document any notes, meetings, etc.
18 to ensure his work was satisfactory and continued to believe in the possibility that he could be
19 transferred to a different department when a position became available either through
20 management or applying through Human Resources.

21    47.    On December 5, 2002 Richard submitted a detailed written statement regarding
22 the incident on September 26, 2002 to Linzmeyer, and requested a transfer because of the
23 harassment and as a reasonable accommodation for his medical condition because the
24 harassment was exacerbating his medical condition.

25    48.    On December 6, 2002 Richard made an additional request for a transfer, this time
26 to a specific vacant position Richard previously held as a full time position in Academic Services
27 Specialist. This request was submitted as part of his latest sexual harassment complaint, and as
28

**COMPLAINT FOR DAMAGES**

16

1  an additional written request for medical accommodation to avoid exacerbating his medical
2  condition; further Richard submitted a standard application to Human Resources in a timely
3  manner for the same position in Academic Services. The first two requests were denied verbally
4  and Richard received no response to his standard application for the position, despite repeated
5  calls to Human Resources.

6      49.      On December 9, 2002 Linzmeyer emailed Richard acknowledging she received
7  the harassment complaint and medical accommodation requests. No response was received in
8  writing or verbally from the Human Resources department regarding the position through the
9  application process.

10     50.      On December 15, 2002 Linzmeyer again confronted Richard at his desk and told
11  Richard his request to transfer was again denied. Management did not conduct an interactive
12  process and only stated the reason was that the vacant posted position as an Academic Services
13  was no longer a full time funded position. No other details, discussion or documentation
14  provided. Richard requested additional information and Linzmeyer informed Richard to "I will
15  have to get back to...(and).. you need to focus on your work". No discussion regarding the
16  harassment was made. Management, therefore, denied any attempts to transfer and any medical
17  accommodations. The harassment allegations continued to be ignored.

18     51.      Richard began to discuss options with the union and whenever Richard attempted
19  to address the previous unresolved concerns with management they would respond and retaliate
20  with "concerns" regarding poor performance. Linzmeyer stated that there were concerns with his
21  performance generally about time management, which created a greater intimidating work
22  environment. Linzmeyer stated that Richard could not perform assigned work correctly or follow
23  directions. When Richard asked Linzmeyer about his request for accommodation or his
24  complaints of harassment, she regularly responded, "you need to focus on your work" or said "I
25  will have to get back to you on that" to avoid addressing Richard's issues.

26     52.      On June 30, 2003, completed Richard's performance evaluation and unfairly
27  ranked him marginally satisfactory overall.

28

**COMPLAINT FOR DAMAGES**

17

53.     On July 9, 2003 Richard reported to Linzmeyer that he saw co-worker Laureen Dutra abusing her position and the finances of the college by waiving the registration fees of her husband, Dave Dutra, and that Laureen Dutra admitted to Richard that she was "waiving Dave's registration fees temporarily to make sure he's not dropped from his classes until I can pay it next week". Linzmeyer became extremely angry at Richard and retorted in a hostile and intimidating fashion, "Shut up! I've heard enough. I don't believe this bullshit," and "I've heard enough from you." Richard was extremely upset and confused so he followed up the meeting with a memo to Linzmeyer on July 10 in which he that he only wanted Linzmeyer to be aware of what Laureen had done and that he was doing his best to protect the college, and was offended by Linzmeyer's response. Richard saw Linzmeyer pick up the memo from her in box the next day and overheard Linzmeyer say to herself when she recognized the handwriting and opened the envelope "What's that faggot up to now?" Richard saw Linzmeyer through the inner-office window turn her back to him while she read the memo, and she immediately shredded it in the shredder next to the copier and walked to her office. Richard contacted the union and began to address his concerns formally.

54.     On July 15, 2003 another bipolar medical episode began due to the recent undue additional stress from Linzmeyer and the continual discrimination and hostility in the Financial Aid Office. Richard was unable to discuss the situation and was emotionally traumatized regarding the recent events.

55.     On July 27, 2003 upon Richard's return from a medical absence related his bipolar disability, Linzmeyer completed a negative performance concern memorandum that claimed that during his absence she investigated his work performance and that there were "concerns" regarding files not processed in a timely manner. Linzmeyer requested at this meeting that Richard provide her with his training manual created by Laureen Dutra and Richard did on July 28, 2003. Linzmeyer would not allow Richard to make a copy before returning it.

56.     On July 30, 2003, Matsuda told Richard she was calling a meeting with him and Linzmeyer to address his ADA concerns. Instead, Matsuda and Linzmeyer focused the meeting

**COMPLAINT FOR DAMAGES**

18

1    on pressuring Richard to sign the negative performance concern memorandum. Richard insisted

2    he wanted union representation to discuss his medical concerns before he would sign negative

3    write-up so he could include a response these false accusations. Richard told Matsuda that

4    Linzmeyer removed his training manual and requested a copy of it or a Processing policies and

5    procedures manual. Linzmeyer said she would provide a copy but did not. Richard also

6    reiterated in the meeting that he previously requested accommodations and that each request had

7    been denied without any dialogue or follow up from management and that he wanted his

8    accommodation requests address with his union representation before they addressed this latest

9    write-up. Richard reiterated that he informally requested that he be allowed to use his computer

10    resources to assist him in completing his work as a possible accommodation, and that it did not

11    make sense for management to deny him use of a computer to complete his work more

12    effectively and efficiently. Richard reminded them they were continuing to not engage in any

13    interactive process regarding his disability and request for accommodations, and that this

14    negative evaluation appeared to be discrimination and retaliation for disclosing his medical

15    condition and for the sexual harassment complaint. Richard insisted from this point forward that

16    a labor union representative be present at any and all meetings regarding any accommodation,

17    harassment or negative performance or discussing regarding performance that can lead to

18    disciplinary action. Richard also requested that management disclose the true purpose of any

19    meetings in the future. Richard followed up with the union.

20        57.    On or about September 18, 2003 and October 3, 2003, Richard followed up his

21    request for a copy of the training or file processing policies and procedures manuals with

22    Linzmeyer. Linzmeyer claimed each time that she would have to get back to him on it and did

23    not provide one.

24        58.    On October 8, 2003 Richard's mother passed away and another extended absence

25    followed including bereavement, sick leave and vacation time in Richard was physically ill.

26        59.    On March 9, 2004 Linzmeyer gave Richard another performance concern memo

27    that would subsequently be used to falsely justify an unsatisfactory special performance

28

COMPLAINT FOR DAMAGES

19

1  evaluation which she completed on March 25, 2004. Richard again insisted on union
2  representation and management continued to deny his request. Richard refused to discuss any
3  concerns without union representation from this point forward due to the manner in which
4  management was addressing his concerns and deteriorating conditions.

5     60.    On March 10, 2004 Linzmeyer denied Richard training for the Dept of Education
6  for the purported reason that he missed a staff office preparatory training on February 27, 2004.
7  However, Karen Pena afterwards instructed Richard in an email that he could complete the
8  preparatory training on his own review the information independently. Richard questioned the
9  reason he was not allowed the training with the other employees if he could have completed the
10  preparatory training on his own before hand since there was sufficient time. Karen Pena stated
11  that Richard would have to address that matter with Linzmeyer.

12     61.    On March 25, 2004, Matsuda and Linzmeyer summoned Richard to a meeting to
13  present him with a "Special Evaluation" document alleging his performance was unsatisfactory.
14  Jon Amons (as union representation of a shop steward) was present at Richard's insistence.

15     62.    On March 30, 2004, Richard requested a meeting to respond to, and to request
16  additional information, regarding the unsatisfactory performance evaluation so he could prepare a
17  written response. He met with Matsuda, Linzmeyer and Jon Amons as a union steward. In the
18  meeting Richard requested management to provide his representative answers to series of
19  questions regarding Richard's concerns of failure to accommodate, retaliation and harassment,
20  and to bring him and Jon Amons an update of any actions taken to address Richard's concerns.
21  Management again denied there any medical accommodations requests on file or approved, that
22  they were only concerned with Richard's work performance, and that management would not
23  address the sexual harassment complaint. Linzmeyer acknowledged she took the training manual
24  and had not returned it, and that she had not approved Richard's request for a file processing
25  policies and procedures manual, under the pretextual excuse that it was outdated.

26     63.    On April 23, 2004 Jon Amons presented an informal grievance letter regarding his
27  medical condition and how it related to the March 9, 2004 special performance evaluation.

28

COMPLAINT FOR DAMAGES

20

1    Management failed to provide a written response.

2        64.    On or about July 3, 2004, Richard underwent a hospitalization for a physical

3    illness, and was required to take four weeks of medical leave/and or vacation time.  He required

4    further treatment in September, 2004, and was required to take four more weeks of medical

5    leave/and or vacation time.

6

7        65.    On October 7, 2004, Richard emailed Matsuda requesting a reasonable

8    accommodation.  Matsuda called a meeting with Richard and Linzmeyer with Jon Amons

9    present.  Matsuda again pressured Richard to falsely agree that he had not made any

10    accommodation requests to her in the past.  Richard again disputed this and insisted on union

11    representation for future meetings. Richard also said that his ongoing and  previous requests for

12    reasonable accommodations still had not been granted, and management had yet to discuss any

13    alternatives or provide a written response.  Richard also protested that he had exhausted his sick

14    time his vacation time due to retaliation from management which exacerbated his medical

15    condition, and that Linzmeyer had further mandated changes in office policies which eliminated

16    the flexibility in his work schedule needed to allow for doctor appointments or intermittent

17    absences.  Richard again requested  formal accommodation for flexibility in his work schedule to

18    allow for doctors appointment , and intermittent medical absences for his bipolar episodes, and a

19    flexible start time when he had to take medications that induced sleep, and flexibility on taking

20    breaks to use restroom facilities due to the side effects of the medications.  These requests were

21    made large part so as to not exhaust his medical and vacation leave.  Richard assured

22    management that he would still put in his full shift and, as needed,  work later to make up for any

23    lost time during the day.   Richard also raised the issue that Linzmeyer still had not provided a

24    copy of the training manual that she took away, and had not provided him with a Processing

25    policies and procedures manual.   Linzmeyer responded, falsely,  that she previously told Richard

26    to create a written FWS policies and procedures manual previously and that she refused to

27    provide him with a file processing manual because it was in the process of being created.

28

**COMPLAINT FOR DAMAGES**

1     66.     On November 16, 2004, Anita Morris, Human Resources Director, Matsuda and

2   Linzmeyer met with Richard and his union representatives and claimed that Richard's request

3   required a formal process because management claimed it was not able to understand his medical

4   condition. At this meeting management refused to acknowledge any wrongdoing in the past or

5   failure to conduct any interactive process. However, instead of initiating a formal interactive

6   process, Anita Morris presented Richard with a Fitness for Duty Examination form and an

7   Authorization to Release Medical Information form. There was no discussion regarding

8   Richard's medical condition and possible accommodations. Instead of initiating an interactive

9   process, management referred Richard to attend a Fitness For Duty Exam. Morris said the

10  reason they were requiring a fitness for duty exam is that CHABOT management "did not

11  understand his medical condition." Debra Grabelle, the union representative and Richard

12  expressed concerns regarding the general release form and the purported process management

13  proposed and concluded that under those conditions, Richard should not sign it. Management

14  then said their involvement in an interactive process was conditioned upon the conclusion of the

15  fitness for duty exam. However, the release form they presented was far too overbroad, did not

16  specify what information could be released, and had no restrictions on Richard's medical history

17  in any way and therefore could not be signed. Subsequent correspondence and dialogue between

18  Debra Grabelle and Anita Morris failed to resolve any of these issues, and Richard and Debra

19  Grabelle agreed to file a grievance first before proceeding with the Fitness for Duty Exam.

20     67.     On December, 14, 2004, RICHARD's psychiatrist, Dr. Weiss, wrote a letter

21  addressed to CHABOT management, and specifically to Anita Morris informing them that

22  RICHARD's bipolar condition required reasonable accommodations to allow him to perform his

23  job, including flexibility in his schedule to allow him to take medications and deal with the

24  sedative effects of the medication, flexibility in arriving to work to allow for more sleep, which

25  the medication caused, and occasionally a need to take a few days off if the medications did not

26  alleviate his bipolar condition. RICHARD also gave a copy of this letter to Matsuda at that

27  time.

28

**COMPLAINT FOR DAMAGES**

22

68. On December 22, 2004, Debra Grabelle filed a grievance on Richard's behalf regarding discrimination and retaliation of his Disability and Sexual Orientation, which also encompassed the sexually harassing conduct.

69. On January 4, 2005 Richard's coworker Laureen Dutra made insulting comments on a computer instant messaging system ridiculing Richard and the length of time he needed to use the restroom, due to Richard's recent colon surgery. Laureen wrote that while on a break "he [Richard] must have made the candy bar himself". Richard complained in writing to Matsuda about this on January 7, 2005, including documentation to support his complaint and of prior abuses by Laureen Dutra of college resources. He met with Matsuda and his union representatives that day to present this complaint. In response, Matsuda assured Richard twice that no disciplinary action would be taken against him in any way shape or form for his actions of interoffice conflict resolution.

70. Debra Grabelle, Richard's union representative, requested and recommended that management take the opportunity to transfer Richard to a vacant position in the Transfer Career Center as the best solution to resolve the Grievance and recent concerns. Matsuda stated that she would consider it only if Richard completed the Fitness for Duty Exam to prove to her that he could perform the functions of a different job. Richard and Debra Grabelle agreed to move forward with the grievance instead.

71. On January 18, 2005, Anita Morris, the Director of Human Resources wrote a letter demanding that Richard to attend a Fitness for Duty Exam scheduled with Dr. Rappaport on February 3, 2005 by the District.

72. On January 25, 2005 Linzmeyer called a meeting to address Level I of the Grievances Richard filed which alleged discrimination based on disability and sexual orientation. Richard and his union representatives were present, and Debra Grabelle stated the concerns generally and informally as the process described.

73. In early February, 2005, Linzmeyer provided a written response to the Grievance and denied each charge. On February 16, 2005 Debra Grabelle, one of the union representatives,

1  emailed Linzmeyer to request the grievance move to Level II. Matsuda falsely stated she did not

2  receive the email and when she received the email it was not received on the proper form as

3  continued evasive actions from management. About that time, Debra Grabelle resigned as

4  Richard's union representative and was replaced by Margaret Cunningham, a short-term

5  temporary representative.

6      74.     On March 8, 2005 a meeting with Matsuda, Margaret Cunningham and Mark

7  Smythe was held to discuss the Grievance at Level II. Matsuda said she had not received the

8  proper form and refused to discuss the Grievance. Matsuda said that she would consider a

9  transfer only if Richard completed the Fitness for Duty Exam. Margaret agreed on Richard's

10  behalf to "table" the grievance pending the completion of the exam to demonstrate Richard's

11  continued cooperation with management with the understanding that continue the grievance

12  would continue at level II once the results of the Fitness for Duty Exam were received.

13      75.     On March 10, 2005 Anita Morris sent Richard a letter insisting that he must attend

14  the Fitness for Duty Exam. Anita Morris falsely stated that the District could not "continue" to

15  accommodate unless the results of the Fitness for Duty Exam were received and insisted that

16  Richard attend.

17      76.     On March 28, 2005 Richard was left with no other choice than attend a Fitness for

18  Duty Exam at Dr. Bernard Rappaport's office, the District physician. Richard provided a

19  HIPPA release form with specific limitations to the District and his personal physician could not

20  release information regarding the exam without the review of his medical records from Dr. Weiss

21  his private psychiatrist and previous medical history regarding his bipolar condition from the

22  mental institution Richard was checked into.

23      77.     On information and belief, the only documents Anita Morris provided Dr.

24  Rappaport were a copy of Richard's most recent request for accommodations, his job description,

25  Dr. Weiss' letter of June 12, 2002;  Morris withheld all other information, and  Dr. Rappaport

26  was not given other medical information relevant to his bipolar condition from Anita Morris.

27  Richard complied to attend the Fitness for Duty Exam with the understanding it was limited in

28

**COMPLAINT FOR DAMAGES**

24

1  scope to issues regarding his bipolar condition. Richard offered to bring Dr. Weiss with him to

2  make him available for Dr. Rappaport to question. Richard stated that either he would ask that

3  Dr. Weiss be present or that Dr. Rappaport would contact Dr. Weiss, his current psychiatrist

4  before making his determination. Dr. Rappaport declined this offer and stated it would not be

5  necessary. Richard answered the questions to the best of his abilities. However, instead of

6  making relevant, good faith, legitimate inquiries to determine whether Richard's bipolar

7  condition warranted accommodation, or whether Richard could perform the essential functions of

8  his job, Dr. Rapport focused almost exclusively on Richard's sexual harassment complaint and

9  the events which occurred in 2001. Ironically, this was the first time anyone associated with

10  CHABOT interviewed Richard about this harassment. Such inquiries were not related to

11  determining the scope of Richard's disability, need for accommodations, or ability to perform the

12  essential functions of his job or potential job. Instead, they were intended as a hostile

13  interrogation regarding Richard's complaints of sexual harassment. Richard objected to and

14  refused to answer these irrelevant questions . Dr. Rappaport could obtain much of Richard's

15  medical history from the medical records already provided in order to make a determination.

16  Richard stated he would provide a medical release for any of the previous doctors who treated his

17  bipolar condition, but Dr. Rappaport said again that he was not interested in seeing these

18  medical records. Dr. Rappaport never contacted Dr. Weiss, Richard's current personal

19  psychiatrist, for any medical history before completing his determination.

20       78.     On April 15, 2005 Richard began sending Linzmeyer weekly emails which

21  provided her with updates to his current work status, so as to document he was current with all

22  his work assignments and to rebut her false accusations he was not timely completing his work.

23  Linzmeyer responded with an email ordered him to stop sending weekly updates.

24       79.     On May 6, 2005 Anita Morris sent Richard a letter stating Dr. Rappaport's

25  Fitness for Duty examination results "indicate you do not have a disability". On May 10, 2005

26  Richard received a copy of the Fitness for Duty Exam results signed by Dr. Rappaport stating he

27  did not have a medical condition that required accommodation.

28

**COMPLAINT FOR DAMAGES**

25

80.    Rappaport's report was false and reflected the pre-determined result which Chabot College hired him to produce. Rappaport's report was also based on a wilfully selective review of records which intentionally sought to screen out evidence of Richard's bipolar illness, such as intentionally omitting records from Dr. Weiss or a mental health hospital to which Richard was admitted – records which Richard requested Dr. Rappaport to review and which Dr. Rapport said he would not.

81.    On June 6, 2005 Richard emailed Linzmeyer that another employee (Ruben Hernandez) did only minor work on one of Richard's assigned group student file and falsely received credit for it. Richard asked Linzmeyer to review it and respond. Linzmeyer did not respond. Linzmeyer also ignored a second email from Richard addressing concerns regarding the SARS GRID drop ins not checked which rebutted her false charges of poor performance."

82.    On June 9, 2005 Linzmeyer and Matsuda conducted Richard's annual performance evaluation with Richard and union representative Mark Smythe. The annual evaluations for 2004 and 2005 were reviewed at the same time, both with falsely unsatisfactory scores which failed to follow proper due process. Both evaluations were reviewed with an unsatisfactory rating in quantity, however satisfactory in quality. Richard requested the supporting documentation and copies of the SARS Grid Report totals for the two annual reviews to respond to the false allegations of low quantity.

83.    On June 13, 2005 Linzmeyer provided Richard with copies of the purportedly supporting documents he requested for the two negative performance evaluations for July 2004 and July 2005.

84.    On June 28, 2005 Richard responded to the two negative performance evaluations with supporting documents to Linzmeyer and Human Resources to be placed in his file. Richard's response asserted that his overall performance was satisfactory when fairly compared with Chabot's standards for productivity.

85.    On July 7, 2005 Matsuda sent emails to Linzmeyer, Richard and Mark Smythe

**COMPLAINT FOR DAMAGES**

26

1   calling for a meeting of inquiry. However, the meeting was to address negative performance

2   concern regarding SARS GRID entries.

3       86.    On July 13, 2005 Matsuda held a meeting questioning the SARS Grid entries of

4   "Packaged" files.

5       87.    On August 28, 2005 Linzmeyer reviewed 20 processed files with Richard, stating

6   that it was an annual audit though Richard did not have documentation of previous annual audits.

7   This audit showed that other employees had far more mistakes that RICHARD.

8       88.    Linzmeyer also denied Richard any union representation, and insisted she was

9   reviewing Richard's files whether he "liked it or not" and regardless of Richard's request that he

10  did not have to respond. Linzmeyer afterwards instructed Richard to return the files claiming

11  that the files had to be corrected. Richard was ordered to address the files as his top priority.

12  Richard asked for written processing policies and procedures manual, to which Linzmeyer,

13  instead of providing this manual, rebuffed his requests by telling him to "focus on your work"

14  and falsely claiming that errors he committed were related to not following the FAFSA

15  instructions correctly. This was not true, as the manual set forth the proper procedures to follow

16  [which Linzmeyer accused him of abrogating]; further, Richard's bipolar condition sometimes

17  affected his memory and required him to refer manuals for guidance on how to follow the

18  procedures; thus the manual was a no-cost, reasonable accommodation for his condition which

19  Linzmeyer intentionally and maliciously withheld.

20      89.    On August 29, 2005 Richard sent a memo to Anita Morris disputing the results of

21  the Fitness for Duty Exam and requested that Richard be allowed to attend the Fitness for Duty

22  Exam with his private psychiatrist present. Richard stated that he was not comfortable with

23  discussing the particular factual events comprising his sexual harassment complaint with Dr.

24  Rappaport as it was not relevant to whether or not Richard was fit for duty. Ironically, Dr.

25  Rappaport's interrogation was the first time anyone associated with CHABOT ever tried to

26  interview him about Sullivan's harassment. RICHARD renewed his request that each of his

27  previous accommodation requests be reconsidered, that Richard be allowed to attend the Fitness

28

**COMPLAINT FOR DAMAGES**

27

1    for Duty Exam again and, again, that management initiate an interactive process. There was no

2    response.

3        90.    On September 16, 2005 Richard emailed Linzmeyer that she was ignoring his

4    multiple requests for the training manual to be returned and a Processing policies and procedures

5    manual be provided. Linzmeyer responded with an apology for not responding earlier and

6    justified her failure to return the training manual because it was "outdated," and falsely tried to

7    deflect her refusal to provide the processing manual by saying each employee was being given a

8    Federal Handbook – which is not related to the processing manual. Richard then responded that

9    to date there was no office written policies and procedures manual and inquired regarding Anita

10   Morris' email. At this point in time, Richard was ahead in his work and was volunteering to take

11   on more assignments. Richard was going to ask if he could help create the manual. He

12   responded in a second email to Linzmeyer that he received an email from Anita Morris addressed

13   to Linzmeyer and inadvertently stating that his concerns were now being forwarded to Laura

14   Schulkind, an attorney at Liebert, Cassidy and Whitmore which represents Chabot College.

15       91.    On September 20, 2005, Matsuda presented a letter from Anita Morris with

16   Linzmeyer present that stated Richard was effective immediately on paid administrative leave

17   and the reason was that management was conducting an investigation of "serious erroneous

18   entries". Chabot management again failed to follow any due process or allow union

19   representation at this meeting. When Richard questioned why his union representation was not

20   present, Matsuda's response was "we do not have to discuss it". Matsuda then ordered Richard

21   to turn his keys (including his desk keys) to Linzmeyer who appeared while Matsuda was

22   handing the letter to Richard. Richard requested to remove some personal belongings from his

23   desk first. This was permitted and Richard was escorted off the campus by both Linzmeyer and

24   Matsuda.

25       92.    On October 6, 2005 President Dr. Robert Carlson sent to Richard the notice of

26   intent to terminate and enclosed documents of the charges via mail. On October 10, 2005 Anita

27   Morris sent a letter stating that a Pre-Disciplinary Skelly Meeting was scheduled to provide

28

**COMPLAINT FOR DAMAGES**

1  Richard with an opportunity to respond to the charges and present information regarding the

2  matter.  The initial hearing was scheduled for October 17, 2005.  The hearing was rescheduled to

3  a later date because Chabot did not provide documents which Richard requested to rebut the

4  charges. On October 20, 2005 Greg Carter requested information on Richard's behalf from Anita

5  Morris prior to the Skelly hearing and it was not provided.

6      93.    On October 24, 2005 Lorenzo Legaspi, as the Chancellor's designee, conducted a

7  Skelly hearing to determine if the termination charges should be submitted to the Board of

8  Trustees.  Richard attended the meeting with the Union Representatives Greg Carter, Mark

9  Smythe and Jon Amons.  Richard stated that he could not answer the questions and do more than

10 deny the charges.  Richard stated he required the documents requested in order to provide

11 evidence and rebut the charges.

12     94.    On October 28, 2005 Lorenzo Legaspi sent a letter to Richard stating that the

13 charges would be forwarded to the Board of Directors and that he was recommending that the

14 employee be terminated.

15     95.    On November 16, 2005 Anita Morris sent a letter to Richard stating that the Board

16 of Trustees met regarding the District's recommendation to dismiss Richard from service.

17 Because Richard had indicated that he wish to have an evidentiary hearing the Board did not

18 review the substance of the recommendation and only considered whether to hold the hearing

19 itself or delegate to a Hearing Officer.  The Board chose to delegate the conducting of the hearing

20 to a Hearing Officer.

21     96.    Richard's attorney, Kelly Armstrong, requested the documents again of October

22 20, 2005 from the District's Attorney for Richard to rebut the charges, and again these

23 documents were not provided.

24     97.    In December 2005 Chabot rescheduled the Skelly Hearing to March 27, 28, and

25 29, 2006.  Chabot then again rescheduled the hearing to May 16, 17, and 18, 2006.  Prior to

26 attending the Hearing Kelly Armstrong again requested the documents necessary for Richard's

27 case, and again, the District failed or refused to provide them.  It was agreed by both attorneys

28

**COMPLAINT FOR DAMAGES**

29

1  that the District would present their case on May 16, 2006 and that the hearing would be
2  scheduled for future time once the documents were received so that Richard and his attorney
3  could rebut the charges.

4      98.    Based on this false representation that the District would subsequently supply the
5  requested documents so Richard could present his defense, Richard's attorney agreed to allow the
6  District to present its case on May 16, 2006 and May, 17. 2006. After the hearing on the 16th both
7  the District and Richard reviewed the request for documentation again.

8      99.    On May 18, 2006 Richard received a letter with some documents from Kathryn
9  Linzmeyer.  However, Linzmeyer still failed and refused to provide Richard with the documents
10  he had repeatedly requested for his case.   The documents Chabot provided did not provide the
11  information needed.

12      100.   On May 22, 2006 Lorenzo Legaspi sent a letter to Richard informing him that he
13  would be suspended without pay pending the completion of the dismissal hearing.  On May 26,
14  2006 Kelly Armstrong contacted the District, again demanding the promised documents which
15  were first requested  October 20, 2005 which Chabot repeatedly refused to provide.

16      101.   On June 2, 2006 Lorenzo Legaspi sent a letter to Richard informing him that a
17  second Skelly meeting was scheduled for June 7, 2006 to address the issue of placing Richard on
18  unpaid administrative leave effective immediately pending the dismissal hearing.

19      102.   On June 7, 2006 the second Skelly meeting was conducted with Richard Ferreira
20  present, Lorenzo Legaspi and Anita Morris.  Kelly Armstrong appeared via speaker phone.
21  Kelly Armstrong objected to taking a second disciplinary action without the completing the
22  hearing and Lorenzo Legaspi said he would review the information and make send his
23  determination in the mail.  On June 20, 2006, Lorenzo Legaspi stated that Richard's request for
24  documents to support his  defense should be addressed in the context of the evidentiary hearing
25  and immediately placed Richard suspension without pay.

26      103.   On July, 18, 2006 Kelly Armstrong withdrew her representation of Richard via a
27  letter to Richard, in the hearing presently scheduled to resume on August 8, 9, 10, 2006. On

28

**COMPLAINT FOR DAMAGES**

1 August 22, 2006, Richard sent an email to Richard Peralta (Acting Human Resource Director, as

2 Anita Morris resigned), stating that Richard was not withdrawing from the hearing and wanted

3 the opportunity to rebut the charges before the District would forward the recommendation to the

4 Board prior to the Board meeting. Richard Peralta denied the request and sent notification with

5 Richard's termination letter.

6   104. On August 22, 2006, the Board met and took final action voting to terminate

7 Richard from employment effective September 5, 2006.

8

### FIRST CAUSE OF ACTION

9 **(Against the CHABOT Defendants for Sexual Orientation Discrimination, Harassment and Retaliation in Violation of FEHA, Government Code Section 12940, *et seq.*)**

10

11   105. The allegations set forth in Paragraphs 1 through104 inclusive, are realleged and

12 incorporated herein by reference as though fully set forth herein.

13   106. At all times herein mentioned, Government Code sections 12940, *et seq.*, were in full

14 force and effect and were binding on Defendants. These require Defendants to refrain from

15 discriminating against or harassing any employees on the basis of sex, and to take all reasonable

16 steps necessary to prevent discrimination and harassment.

17   107. The acts of Defendants, and each of them, as described more fully above, constitute

18 a pattern and continuous course of harassment on the basis of sexual orientation in violation of

19 Government Code sections 12940(j)(1) (formerly section 12940(h)(1)), and created an intolerable

20 work environment on account of Plaintiff's sexual orientation.

21   108. The sexual orientation harassment of Plaintiff by Defendants, including without

22 limitation, Jim Sullivan, created an oppressive, hostile, intimidating and/or offensive work

23 environment for Plaintiff and interfered with his emotional well-being and ability to perform his

24 duties. The sexual orientation harassment was sufficiently severe and pervasive as to materially alter

25 Plaintiff's conditions of employment, and to create an abusive working environment.

26   109. At all times herein mentioned, Government Code section 12940(k) (formerly section

27 12940(I)) was in full force and effect and was binding on Defendants. This subsection requires

28 Defendants to take all reasonable steps necessary to prevent discrimination and harassment from

**COMPLAINT FOR DAMAGES**

1   occurring. As alleged above, Defendants violated this subsection by failing to take all reasonable
2   steps necessary to prevent harassment from occurring.

3        110.   Plaintiff is informed and believe and thereupon alleges that Defendants failed to
4   provide adequate training to its owners, supervisors and managers.

5

6

7        111.   At all times herein mentioned, Government Code section 12940(h) (formerly
8   12940(f)) was in full force and effect and was binding on Defendants. This section provides that it
9   is an unlawful practice for any employer or person to discharge, expel, or otherwise discriminate
10  against any person because the person has opposed any practices forbidden by the Fair Employment
11  and Housing Act ("FEHA") or because the person has filed a complaint, testified or assisted in any
12  proceeding. Defendants conducted alleged herein discharged, expelled, and otherwise discriminated
13  against any Richard because he opposed and complained about Defendants' sexual orientation
14  discrimination and harassment.

15       112.   After Plaintiff reported his allegations of sexual orientation harassment by Sullivan,
16  Defendants, and each of them, retaliated against Plaintiff, without limitation in the following ways:
17  refusing to investigate his allegations, denigrating Plaintiff for raising these allegations and
18  threatening him with disciplinary action unless he dropped it, telling Richard he would be the subject
19  of a sexual harassment complaint and/or lawsuit by Sullivan if Richard proceeded with filing a
20  complaint against Sullivan, deterring plaintiff by not providing him with the proper information
21  about procedures for reporting harassment and not providing him with the forms to do so,
22  unfairly and falsely criticizing his work, including using false allegations from Sullivan as a basis
23  to do so, engaging in a concerted effort to false write-up supposed lapses in his work to create a false
24  trail of progressive write-ups leading to termination, removing him from the online services job and
25  forcing him to work in close proximity with Sullivan, denying his request to stay in the Student
26  Online Services jobs within four hours of receiving it, falsely reprimanding him for unexcused
27  absences, verbally abusing him, threatening him with termination if he did not drop his complaint
28

COMPLAINT FOR DAMAGES

32

1   regarding Sullivan, refusing to provide him with requested training manuals, subjecting him to a
2   punitive "fitness for duty exam", attempting to coerce Richard into signing off on a false
3   performance concern memos, refusing to let Richard use excel computer spreadsheets to assist in his
4   work, denying requests for transfers, denying him training for the Dept. Of Education, Matsuda's
5   disparaging characterization of Richard's complaint of sexual harassment as a symptom of his
6   medical condition and/or being related to criticisms of his work performance, her coercion to get him
7   to assent to disclose his medical condition to his peers and supervisors, failing to provide reasonable
8   accommodations to plaintiff which they offered to employees who had not complained of,
9   pressuring plaintiff to falsely state he had not previously requested reasonable accommodations for
10  his disability and falsely denying that he had,  unreasonably delaying plaintiff's *Skelly* hearing and
11  denying him evidence needed to rebut their allegations of false performance and terminating him,
12  and other conduct alleged hereinabove.

13

14

15      113.   At all times herein mentioned, Government Code section 12940(a) was in full force
16  and effect and was binding on Defendants.  This section provides that it is an unlawful practice for
17  any employer, because of sexual orientation, to refuse to hire or employ the person or to refuse to
18  or to discriminate against the person in compensation or in terms, conditions, or privileges of
19  employment.

20      114.   The conduct of Defendants  alleged herein, constituted to refusal  to hire or employ
21  Richard in positions he desired, and discriminated against Richard in his compensation, terms,
22  conditions, and/or privileges of employment, and was motivated by sexual orientation
23  discrimination.

24      115.   Said discrimination and retaliation also took the form of failing to accommodate
25  Plaintiff's disabilities because of his sexual orientation, whereas Defendant accommodates
26  heterosexuals with disabilities.

27      116.   Each incident of Defendants harassment, retaliation and/or discrimination,

28

**COMPLAINT FOR DAMAGES**

33

1    including the maintenance of a hostile work environment as part of the retaliation, was continuous,

2    ongoing and part of a pattern and overall course of conduct which continued unabated and

3    uninterrupted throughout plaintiff's employment, and lasted at least until plaintiff's termination in

4    September, 2006.    Accordingly, said harassment, retaliation and/or discrimination constituted a

5    continuing violation which makes all of plaintiff's claims timely.

6        117.    As a proximate result of Defendants' willful, knowing and intentional acts of

7    discrimination, harassment and retaliation against Plaintiff, as alleged above, Plaintiff has suffered,

8    and will continue to suffer: embarrassment, humiliation, mental anguish, emotional and physical

9    distress and harm; economic losses in earnings, bonuses, deferred compensation, employment

10    benefits, earning  capacity, opportunities for employment advancement and work experience;

11    economic losses for medical treatment and related services and expenses, all to his damage in a sum

12    according to proof.

13        118.    The aforementioned acts were done willfully and maliciously and with intent to

14    injure and oppress plaintiff, in conscious disregard of the Plaintiff's  mental well-being. and

15    therefore plaintiff is entitled to exemplary and punitive damages against defendants, and each of

16    them.

17        WHEREFORE Plaintiff prays for judgment as set forth below.

18

19                    <u>SECOND  CAUSE OF ACTION</u>

**(The CHABOT DEFENDANTS, for Failure to Provide Reasonable Accommodations for**
20    **Plaintiff's Disability in Violation of FEHA, Government Code Section 12940, *et seq.*)**

21        119.    The allegations set forth in Paragraphs 1 through123 inclusive, are realleged and

22    incorporated herein by reference as though fully set forth herein.

23        120.    Plaintiff's bipolar condition is a  mental condition/disease/disorder/ that limits, and

24    substantially limits major life activities including, without limitation, sleep, work, eating and social

25    interactions, as does the medication required to treat the condition. At all times since 2001,

26    Defendants and each of their managers and supervisors knew of RICHARD'S bipolar condition

27    and/or perceived that he was bipolar. Richard was capable of performing the essential functions of

28

COMPLAINT FOR DAMAGES

1    his positions with reasonable accommodation.

2        121.    Defendants failed to provide reasonable accommodation for RICHARD'S bipolar

3    condition.

4        122.    Said failure to provide reasonable accommodation for RICHARD'S bipolar condition

5    and the attendant stress this failure to accommodate exacerbated, aggravated his condition and was

6    a substantial factor in triggering bipolar episodes.

7        123.    Defendant's failure to provide reasonable accommodation was continuous, ongoing

8    and part of a pattern and overall course of conduct which continued unabated and uninterrupted

9    throughout plaintiff's employment, and lasted at least until plaintiff's termination in September,

10   2006.  Accordingly, said conduct constituted a continuing violation which makes all of plaintiff's

11   claims for failure to reasonably accommodate plaintiff's bipolar condition timely.

12       124.    As a proximate result of Defendants' willful, knowing and intentional failure to

13   provide reasonable accommodation, as alleged above, Plaintiff has suffered, and will continue to

14   suffer: embarrassment, humiliation, mental anguish, emotional and physical distress and harm;

15   economic losses in earnings, bonuses, deferred compensation, employment benefits, earning

16   capacity, opportunities for employment advancement and work experience; economic losses for

17   medical treatment and related services and expenses, all to his damage in a sum according to proof.

18       125.    The aforementioned acts were done willfully and maliciously and with intent to

19   injure and oppress plaintiff, in conscious disregard of the Plaintiff's  mental well-being. and

20   therefore plaintiff is entitled to exemplary and punitive damages The CHABOT DEFENDANTS.

21       WHEREFORE Plaintiff prays for judgment as set forth below.

22

23                          **THIRD CAUSE OF ACTION**
     **(The CHABOT DEFENDANTS, for Disability Discrimination, Harassment and Retaliation
     in Violation of FEHA, Government Code Section 12940, *et seq.*)**

24

25       126.    The allegations set forth in Paragraphs 1 through134 inclusive, are realleged and

     incorporated herein by reference as though fully set forth herein.

26

27       127.    At all times herein mentioned, Government Code sections 12940, *et seq.*, were in full

28

                          **COMPLAINT FOR DAMAGES**

1  force and effect and were binding on Defendants.  These require Defendants to refrain from
2  discriminating against or harassing any employees on the basis of mental disability,  to take all
3  reasonable steps necessary to prevent discrimination and harassment.

4      128.    The acts of Defendants, and each of them, as described more fully above, constitute
5  a pattern and continuous course of  harassment on the basis of mental disability in violation of
6  Government Code sections 12940(j)(1) (formerly section 12940(h)(1)), and created an intolerable
7  work environment on account of Plaintiff's disability,

8      129.    The mental disability harassment of Plaintiff by Defendants created an oppressive,
9  hostile, intimidating and/or offensive work environment for Plaintiff and interfered with his
10  emotional well-being and ability to perform his duties.  The mental disability harassment was
11  sufficiently severe and pervasive as to materially alter Plaintiff's conditions of employment, and to
12  create an abusive working environment.

13      130.    At all times herein mentioned, Government Code section 12940(k) (formerly section
14  12940(I)) was in full force and effect and was binding on Defendants. This subsection requires
15  Defendants to take all reasonable steps necessary to prevent discrimination and harassment from
16  occurring.  As alleged above, Defendants violated this subsection by failing to take all reasonable
17  steps necessary to prevent harassment or discrimination from occurring.

18      131.  Plaintiff is  informed and believe and thereupon alleges that Defendants failed to
19  provide adequate training to its officers,  supervisors and managers regarding mental disability
20  discrimination, harassment or retaliation.

21

22      132.    At all times herein mentioned, Government Code section 12940(e) was in full force
23  and effect and was binding on Defendants.  Section 12940(e)(1) prohibits any employer to require
24  any medical or psychological examination of an applicant, to make any medical or psychological
25  inquiry of an applicant, to make any inquiry whether an applicant has a mental disability or physical
26  disability or medical condition, or to make any inquiry regarding the nature or severity of a physical
27  disability, mental disability, or medical condition.  Section 12940(e) (2) provides an exception when

28

**COMPLAINT FOR DAMAGES**

36

1    such exam or inquiry is to ascertain the ability of an applicant to perform job-related functions, or

2    in response to an applicant's request for reasonable accommodation. Section 12940(e)(3) permits

3    a medical or psychological inquiry or examination of a job applicant after an employment offer has

4    been made but prior to the commencement of employment duties, but only if the examination or

5    inquiry is job-related and consistent with business necessity and that all entering employees in the

6    same job classification are subject to the same examination or inquiry.

7         133.    On or about March 28, 2005, CHABOT required Richard to submit to an exam and

8    inquiry by it's hired Psychiatrist, Dr. Rappaport. Said exam and inquiry violated Section 12940(e)

9    in that it made improper inquiries regarding plaintiff that were not, in good faith, related to

10    ascertaining plaintiff's ability to perform job related functions, were not in response to requests for

11    reasonable accommodations, were not job-related and were not consistent with business necessity

12    and were not required of all other or any other entering employees in the same job classification.

13    Said examination was undertaken in bad faith and focused on plaintiff's complaints of sexual

14    harassment in 2001 and not his medical condition, ability to perform essential job functions or need

15    for accommodation.

16         134.    Instead of serving a legitimate function, said exam was intended to, and did in fact

17    discriminate against and harass t Plaintiff based on his sexual orientation, mental disability, and in

18    retaliation for Plaintiff taking steps to complain about and protest said harassment and discrimination

19    against him (as well protesting sexual harassment) and in retaliation for him seeking reasonable

20    accommodation for his mental disability.

21

22

23         135.    At all times herein mentioned, Government Code section 12940(h) (formerly

24    12940(f)) was in full force and effect and was binding on Defendants. This section provides that it

25    is an unlawful practice for any employer or person to discharge, expel, or otherwise discriminate

26    against any person because the person has opposed any practices forbidden by the Fair Employment

27    and Housing Act ("FEHA") or because the person has filed a complaint, testified or assisted in any

28

**COMPLAINT FOR DAMAGES**

1  proceeding. Defendants conduct as alleged herein discharged, expelled, and otherwise discriminated
2  against Richard because he opposed and complained about Defendants' failure to reasonably
3  accommodate his mental disability and because he opposed and complained about Defendant's
4  mental disability discrimination and harassment.

5

6      136.  At all times herein mentioned, Government Code section 12940(a) was in full force
7  and effect and was binding on Defendants. This section provides that it is an unlawful practice for
8  any employer, because of mental disability, to refuse to hire or employ the person or to refuse to or
9  to discriminate against the person in compensation or in terms, conditions, or privileges of
10  employment.

11      137.  The conduct of Defendants alleged herein, constituted to refusal to hire or employ
12  Richard in positions he desired, and discriminated against Richard in his compensation, terms,
13  conditions, and/or privileges of employment, and was motivated by mental disability discrimination.

14      138.  Each incident of Defendants harassment, retaliation and/or discrimination, including
15  the maintenance of a hostile work environment, was continuous, ongoing and part of a pattern and
16  overall course of conduct which continued unabated and uninterrupted throughout plaintiff's
17  employment, and lasted at least until plaintiff's termination in September, 2006. Accordingly, said
18  harassment, retaliation and/or discrimination constituted a continuing violation which makes all of
19  plaintiff's claims timely.

20      139.  As a proximate result of Defendants' willful, knowing and intentional Disability
21  Discrimination, Harassment and Retaliation as alleged above, Plaintiff has suffered, and will
22  continue to suffer: embarrassment, humiliation, mental anguish, emotional and physical distress and
23  harm; economic losses in earnings, bonuses, deferred compensation, employment benefits, earning
24  capacity, opportunities for employment advancement and work experience; economic losses for
25  medical treatment and related services and expenses, all to his damage in a sum according to proof.

26      140.  The aforementioned acts were done willfully and maliciously and with intent to
27  injure and oppress plaintiff, in conscious disregard of the Plaintiff's mental well-being. and

28

**COMPLAINT FOR DAMAGES**

1   therefore plaintiff is entitled to exemplary and punitive damages against defendants, and each of

2   them.

3        WHEREFORE Plaintiff prays for judgment as set forth below.

4

5

6                              **FOURTH CAUSE OF ACTION**
    **(The CHABOT DEFENDANTS, for Sexual Harassment, Discrimination and Retaliation**
    **Against Plaintiff's Efforts to Protest Sexual Harassment in Violation of FEHA,**
7                        **Government Code Section 12940, *et seq.*)**

8        141.   The allegations set forth in Paragraphs 1 through 153 inclusive, are realleged and

9   incorporated herein by reference as though fully set forth herein.

10  At all times herein mentioned, Government Code sections 12940, *et seq.*, were in full force and

11  effect and were binding on Defendants. These require Defendants to refrain from discriminating

12  against or harassing any employees on the basis of sex, and to take all reasonable steps necessary to

13  prevent discrimination and harassment.

14       142.   The acts of Defendants, and each of them, as described more fully above, constitute

15  a pattern and continuous course of harassment on the basis of sex and gender in violation of

16  Government Code sections 12940(j)(1) (formerly section 12940(h)(1)), and created an intolerable

17  work environment on account of Plaintiff's sex and gender.

18       143.   The sex and gender harassment of Plaintiff by Defendants, including without

19  limitation, Jim Sullivan, Kathy Linzmayer, Melinda Matsuda created an oppressive, hostile,

20  intimidating and/or offensive work environment for Plaintiff and interfered with his emotional well-

21  being and ability to perform his duties. The sex and gender harassment was sufficiently severe and

22  pervasive as to materially alter Plaintiff's conditions of employment, and to create an abusive

23  working environment.

24       144.   At all times herein mentioned, Government Code section 12940(k) (formerly section

25  12940(I)) was in full force and effect and was binding on Defendants. This subsection requires

26  Defendants to take all reasonable steps necessary to prevent discrimination and harassment from

27  occurring. As alleged above, Defendants violated this subsection by failing to take all reasonable

28

                          **COMPLAINT FOR DAMAGES**

                                                                              39

1   steps necessary to prevent harassment from occurring.

2       145.    Plaintiff is informed and believe and thereupon alleges that Defendants failed to
3   provide adequate training to its owners, supervisors and managers.

4

5       146.    Plaintiff first complained about Jim Sullivan's sexual harassment in June 2001, and
6   throughout his employment, has made repeated and continuous requests that Defendants investigate
7   and redress Sullivan's harassment, and has protested unfair discrimination of him based on his
8   gender. In response, Defendants have retaliated against plaintiff by a continuous series of hostile
9   and retaliatory actions, including, without limitation, continuously false criticisms of his work and
10  an escalating and retaliatory campaign to falsely impose progressive discipline as part of a long-
11  range course of conduct to engineer his termination, which continued unabated until this course of
12  conducted culminated in his termination on September 6, 2006. Defendants also retaliated by further
13  harassing, insulting and denigrating plaintiff, maintenance of a hostile and intolerable work
14  environment, refusing to reasonably accommodate his bipolar condition and subjecting him to a
15  bad-faith and improper "fitness for duty examination." Said conduct violates the prohibitions against
16  retaliation set forth in Gov. Code §12940(h).

17

18      147.    At all times herein mentioned, Government Code section 12940(a) was in full force
19  and effect and was binding on Defendants. This section provides that it is an unlawful practice for
20  any employer, because of sex, to refuse to hire or employ the person or to refuse to or to discriminate
21  against the person in compensation or in terms, conditions, or privileges of employment.

22      148.    The conduct of Defendants alleged herein, constituted to refusal to hire or employ
23  Richard in positions he desired, and discriminated against Richard in his compensation, terms,
24  conditions, and/or privileges of employment, and was motivated by sex discrimination.

25

26      149.    Each incident of Defendants harassment, discrimination, retaliation, including the
27  maintenance of a hostile work environment as part of the retaliation, was continuous, ongoing and

28

**COMPLAINT FOR DAMAGES**

40

1   part of a pattern and overall course of conduct which continued unabated and uninterrupted

2   throughout plaintiff's employment, and lasted at least until plaintiff's termination in September,

3   2006.   Accordingly, said harassment, retaliation and/or discrimination constituted a continuing

4   violation which makes all of plaintiff's claims timely.

5       150.   As a proximate result of Defendants' willful, knowing and intentional retaliation for

6   complaining about sexual harassment, as alleged above, Plaintiff has suffered, and will continue to

7   suffer: embarrassment, humiliation, mental anguish, emotional and physical distress and harm;

8   economic losses in earnings, bonuses, deferred compensation, employment benefits, earning

9   capacity, opportunities for employment advancement and work experience; economic losses for

10  medical treatment and related services and expenses, all to his damage in a sum according to proof.

11      151.   The aforementioned acts were done willfully and maliciously and with intent to

12  injure and oppress plaintiff, in conscious disregard of the Plaintiff's  mental well-being. and

13  therefore plaintiff is entitled to exemplary and punitive damages against defendants, and each of

14  them.

15      WHEREFORE Plaintiff prays for judgment as set forth below.

16

17  **FIFTH CAUSE OF ACTION**
**(The CHABOT DEFENDANTS, for Wrongful Termination in Violation of Plaintiff's Due Process and Equal Protection Rights)**

18

19      152.   The allegations set forth in Paragraphs 1 through178 inclusive, are realleged and

20  incorporated herein by reference as though fully set forth herein.

21      153.   Plaintiff, as a public employee, has a constitutionally protected interest in his

22  employment which prevents defendants from terminating his employment without due process or

23  equal protection. Defendants wrongfully terminated Plaintiff's employment on September 5, 2006

24  because the *Skelly* hearing was rife with procedural and substantive due process deficiencies

25  in violation of his due process and equal protection rights under the California Constitution and the

26  Fifth and Fourteenth Amendments of the U.S. Constitution by:

27          a.      preventing plaintiff from obtaining and presenting evidence which was in

28                  DEFENDANT's  sole possession and control which they  were obliged to

**COMPLAINT FOR DAMAGES**

41

1    produce so plaintiff could defend his right to employment, and by

2    affirmatively refusing to produce such evidence despite repeated requests for

3    said evidence by Plaintiff and his counsel;

4        b.    by unreasonably delaying his *Skelly* hearing for nearly a year;

5        c.    by refusing to let him present his case after his attorney withdrew, despite

6    plaintiff's explicit request to do so on or about August 22, 2006.

7        154.    On information and belief, Defendants have not deprived other employees of these

8    rights. As a result of the acts of Defendant, Plaintiff has suffered actual damages as set forth above

9    and in an amount to be determined at trial.

10        155.    As a result of the acts of Defendant, Plaintiff has suffered actual damages as set forth

11    above and in an amount to be determined at trial.

12        WHEREFORE, PLAINTIFF prays for judgment as more fully set forth below.

13

14    

**SIXTH CAUSE OF ACTION**
**CIVIL RIGHTS CLAIM UNDER 42 USC §1983**
**AGAINST ALL DEFENDANTS**

15    Plaintiff incorporates by reference the allegations of paragraphs 1 through __ above, as

16    though fully set forth herein.

17        156.    At all times material to this action DEFENDANT, and each of their managers,

18    officers and supervisors, including, without limitation, Katheryn Linzmeyer (DIR) , Melinda

19    Matsuda (VP), Dr. Robert Carlson, President, Lorenzo Legaspi Vice Chancellor, Anita Morris,

20    Human Resources Director, Sharon Trethan, Human Resources Director, have acted , and continue

21    to act, under color or custom or usage of law, and the laws of the State of California, and under their

22    authority as supervisors, managers or officers with the power to direct, supervise and oversee

23    Plaintiff.

24        157.    The DEFENDANTS, and each of the officers, managers and supervisors identified

25    in above, have individually and collectively discriminated against the plaintiff on the basis of the

26    fact that Plaintiff is male.

27        158.    The DEFENDANTS, and each of the officers, managers and supervisors identified

28

COMPLAINT FOR DAMAGES

42

1 above have individually and collectively discriminated against the plaintiff on the basis of the fact
2 that Plaintiff is homosexual.

3     159.   The DEFENDANTS, and each of the officers, managers and supervisors identified
4 above have individually and collectively discriminated against the plaintiff on the basis of the fact
5 that Plaintiff has a mental disability.

6     160.   The acts of discrimination, harassment, retaliation, and creation of an ongoing hostile
7 work environment set forth herein which were committed against Plaintiff violated his Constitutional
8 Rights to be secure in his person, his right to free speech, movement, association and assembly, his
9 right to privacy, his right to be free from unreasonable search and seizures, to be free from
10 involuntary servitude, and his rights to due processes of law before being deprived of liberty or
11 property, his right to petition his government for redress of grievances, and to be free from
12 employment discrimination based on his sex and/or his sexual orientation and/or his mental
13 disability, all in violation of the first, fourth, fifth, ninth, thirteenth, and fourteenth amendments to
14 the U.S. Constitution and of 42 USC §1983.

15     161.   The DEFENDANTS, and each of the officers, managers and supervisors identified
16 above, in acting to deprive plaintiff of his rights went far beyond actions reasonably necessary for
17 the discharge of their duties and within the scope of their employment, and instead misused their
18 official powers and acted from a willful and malicious intent to deprive plaintiff of his civil rights
19 and cause him grievous injury thereby. The DEFENDANTS, and each of the officers, managers and
20 supervisors identified above, in acting to deprive plaintiff of his rights, acted intentionally,
21 knowingly, willfully, and with gross disregard of plaintiff's rights, in ratifying and condoning the
22 oppressive acts of each other and of Jim Sullivan in depriving plaintiff of his rights.

23     162.   The DEFENDANTS, and each of the officers, managers and supervisors identified
24 above acted in an outrageous and systematic patter of harassment, oppression, bad faith, employment
25 discrimination, cover-up and retaliation directed at plaintiff continuing from January 2001 to the date
26 of plaintiff's termination in September, 2006.

27     163.   Each incident of Defendants violation of plaintiff's civil rights, harassment,
28

COMPLAINT FOR DAMAGES

43

1    discrimination, retaliation, including the maintenance of a hostile work environment as part of the

2    retaliation, was continuous, ongoing and part of a pattern and overall course of conduct which

3    continued unabated and uninterrupted throughout plaintiff's employment, and lasted at least until

4    plaintiff's termination in September, 2006. Accordingly, said harassment, retaliation and/or

5    discrimination constituted a continuing violation which makes all of plaintiff's claims timely.

6        164.   As a result of the acts of Defendant, Plaintiff has suffered actual damages as set forth

7    above and in an amount to be determined at trial.

8        165.   The aforementioned acts were done willfully and maliciously and with intent to

9    injure and oppress plaintiff, in conscious disregard of the Plaintiff's mental well-being. and

10   therefore plaintiff is entitled to exemplary and punitive damages against defendants, and each of

11   them.

12       WHEREFORE Plaintiff prays for judgment as set forth below.

13

14

15   **SEVENTH CAUSE OF ACTION**
     **CIVIL RIGHTS CLAIM UNDER 42 USC §1985(3) AND THE 1ST, 4TH, 5TH, 9TH, 13TH, AND**
     **14TH Amendments to the U.S. Constitution**
16   **AGAINST ALL DEFENDANTS**

17
         Plaintiff incorporates by reference the allegations of paragraphs 1 through ___ above, as
18
     though fully set forth herein.
19
         166.   By the aforesaid discriminatory and retaliatory acts and omissions of the defendants,
20
     and each of their managers, officers and supervisors, including, without limitation, Katheryn
21
     Linzmeyer, Melinda Matsuda, Dr. Robert Carlson, Lorenzo Legaspi, Anita Morris, Sharon Trethan,
22
     conspired, planned agreed and intended to harass, intimidate, retaliate against, discriminate against,
23
     terminate and cause economic and psychological injury to plaintiff.
24
         167.   The purpose of the Defendants in so acting was to prevent plaintiff, through economic
25
     and psychological violence and intimidation, from seeking equal protection of the laws, and from
26
     enjoying the equal privileges and immunities of citizens under the Constitution and laws of the
27
     United States and the State of California, including, but not limited to plaintiff's rights to be secure
28

**COMPLAINT FOR DAMAGES**

1  in his person, his right to free speech, movement, association and assembly, his right to privacy, his

2  right to be free from unreasonable search and seizures, to be free from involuntary servitude, and his

3  rights to due processes of law before being deprived of liberty or property, his right to petition his

4  government for redress of grievances, and to be free from employment discrimination based on his

5  sex and/or his sexual orientation and/or his mental disability, all in violation of the first, fourth, fifth,

6  ninth, thirteenth, and fourteenth amendments to the U.S. Constitution and of 42 USC §1983.

7       168.   Numerous overt acts, but by no means all of the conspirators' overt acts in furtherance

8  of their conspiracy are enumerated above, and include, without limitation, dissuading plaintiff from

9  seeking redress for his complaints of harassment and lack of reasonable accommodation, false and

10  fraudulent progressive discipline culminating in a wrongful termination, creating a hostile work

11  environment, in part, to coerce plaintiff to quit, attempting to coerce plaintiff to deny he made

12  complaints of harass or requests for accommodation, attempting to coerce plaintiff to sign off on

13  memo's of concern containing false allegations of poor performance, subjecting plaintiff to a bad-

14  faith and punitive fitness for duty exam and withhold relevant medical information from the

15  examining doctor so as to ensure an result unfavorable to plaintiff.

16       169.   These overt acts were intended to deprive plaintiff of rights under U.S.C. §2000e *et*

17  *seq.* and/or FEHA, but also to deprive him of his rights to free of employment discrimination under

18  the equal protection provisions of the fourteenth amendment, and the constitutional civil rights

19  described hereinabove.

20       170.   As a result of the acts of Defendants, Plaintiff has suffered actual damages as set forth

21  above and in an amount to be determined at trial.

22       171.   The aforementioned acts were done willfully and maliciously and with intent to

23  injure and oppress plaintiff, in conscious disregard of the Plaintiff's mental well-being. and

24  therefore plaintiff is entitled to exemplary and punitive damages against defendants, and each of

25  them.

26       WHEREFORE Plaintiff prays for judgment as set forth below.

27  ### EIGHTH CAUSE OF ACTION
     (Against All Defendants)

28       COMPLAINT FOR DAMAGES

## Violation of Title IX of the Education Amendments of 1972
### (20 USC 1681 et seq.)

172.     The allegations set forth in Paragraphs 1 through198 inclusive, are realleged and incorporated herein by reference as though fully set forth herein, and especially the allegations set forth in the preceding cause of action.

173.   CHABOT  receives federal financial assistance for its public education programs. Defendants' ratification of conduct and failure to respond to Plaintiffs' complaints or to stop such harassment despite their duty to do so and despite Plaintiffs' request and pleas, created an intimidating, hostile, offensive, and abusive school environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq.

174.   The conduct of Defendant's supervisors, managers and officers,  and Jim Sullivan as alleged herein, constituted sexual harassment and sex discrimination. Said conducted both created a hostile work environment. Each of Defendant's supervisors, managers and officers had ample notice of the substantial risk of sexual harassment, sex discrimination  and abuse of plaintiff by Jim Sullivan and/or by Kathy Linzmeyer and/or Melinda Matsuda.  Said notice to defendants began in or about early 2001, when plaintiff first complained about Jim Sullivan.

175.   Defendant CHABOT's officers, managers and supervisors had the authority to intervene and investigate said harassment and discrimination, as well as the authority to supervise and discipline Jim Sullivan, Linzmeyer and Matsuda, and thus prevent further harassment of or discrimination to plaintiff ..

176.   Despite such notice, and despite such authority, CHABOT's managing agents, officers, managers and supervisors, did nothing to investigate, intervene, discipline, supervise deter, prohibit, or prevent harassment of or discrimination to plaintiff.  No defendant advised plaintiff of the Title IX Employee/Grievance Procedure.  As a result of these failures, Plaintiff's right to a non-hostile work environment was denied.

177.   Defendants' ratification of conduct and failure to respond to Plaintiffs' complaints or stop such harassment, discrimination or hostile work environment despite their duty to do so and ample notice of such conduct, created an intimidating, hostile, offensive, and abusive employment

1 environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et

2 seq. Said conduct by defendants constituted a deliberate indifference to the substantial risk of harm

3 and/or actual harm to plaintiff.

4      178.   Said course of conduct by defendants, and each of them, constituted a continuing

5 violation of plaintiff's rights and a continuous course of conduct causing harm to plaintiff.

6 Accordingly, each of defendant's wrongful acts are within any applicable statutes of limitations.

7      179.   The aforementioned acts were done willfully and maliciously and with intent to

8 injure and oppress plaintiff, in conscious disregard of the Plaintiff's mental well-being. and

9 therefore plaintiff is entitled to exemplary and punitive damages against defendants, and each of

10 them.

11      180.   As a result of the acts of Defendant, Plaintiff has suffered actual damages as set forth

12 above and in an amount to be determined at trial.

13     WHEREFORE, Plaintiff prays for judgment as set forth below.

14

15                       **PRAYER FOR RELIEF**

16    **WHEREFORE**, Plaintiff prays for relief as follows:

17     WHEREFORE, plaintiff prays for judgment against defendants, and each of them, within the

18 jurisdictional limits of this court as follows:

19         1.    General damages in an amount to be determined according to proof;

20         2.    Special damages for, without limitation, medical expenses, loss of earnings,

21 benefits and future earning, and other consequential and incidental expenses according to proof;

22         3.    Punitive damages in an amount to be determined according to proof

23         4.    Pre-judgment interest as allowed by law;

24         5.    Reasonable attorneys' fees as allowed by law, including, without limitation,

25 42 USC 1988 and FEHA.

26         6.    Costs of suit incurred herein; and

27         7.    For injunctive relief to prohibit the discriminatory and retaliatory practices and

28                    **COMPLAINT FOR DAMAGES**

47

1  harassment and violations of Constitutional Rights described herein, as well as to require defendants

2  to provide reasonable accommodations for plaintiff's disability and to reinstate his employment;

3          8.      For such other and further relief as the Court deems fair and just.

4

5  Dated: July 11, 2007

6                                 By

7                                    Richard A. Ferreira

                                  In pro per

8

9  **DEMAND FOR JURY TRIAL**

10      Plaintiff hereby demands a trial by jury.

11

12  Dated: July 11, 2007

13

14                                 By              Richard A. Ferreira

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                **COMPLAINT FOR DAMAGES**

**Exhibit B**

1  LOUIS A. LEONE, ESQ. (SBN: 099874)

2  **STUBBS & LEONE**
   A Professional Corporation

3  2175 N. California Blvd., Suite 900
   Walnut Creek, CA  94596

4  Telephone:   (925) 974-8600
   Facsimile:    (925) 974-8601

5

ENDORSED
FILED
ALAMEDA COUNTY

APR 2 8 2008

CLERK OF THE SUPERIOR COURT
By_____ *P. Bir*
                        Deputy

6

7  Attorney for Defendant CHABOT LA POSITAS COMMUNITY COLLEGE DISTRICT;
   KATHERYN LINZMEYER; MELINDA MATSUDA; DR. ROBERT CARLSON; LORENZO

8  LEGASPI; ANITA MORRIS; SHARON TRETHAN

9

10                    SUPERIOR COURT OF CALIFORNIA

11                        COUNTY OF ALAMEDA

12  RICHARD FERREIRA                    **Case No.:  HG 07334984**

13          Plaintiff,

14                                      **ANSWER TO COMPLAINT FOR DAMAGES**

15  vs.

16  CHABOT COLLEGE; CHABOT LAS

17  POSITAS COMMUNITY COLLEGE
    DISTRICT; KATHERYN LINZMEYER;

18  MELINDA MATSUDA; DR. ROBERT
    CARLSON; LORENZO LEGASPI; ANITA

19  MORRIS; SHARON TRETHAN AND

20  DOES 1-25,

21          Defendants.

22

23    COME NOW DEFENDANTS CHABOT LA POSITAS COMMUNITY COLLEGE DISTRICT

24  (also erroneously sued herein as CHABOT COLLEGE); KATHERYN LINZMEYER; MELINDA

25   MATSUDA; DR. ROBERT CARLSON; LORENZO LEGASPI; ANITA MORRIS; SHARON

26  TRETHAN, (hereinafter "Defendants") for their answer to the unverified Complaint of plaintiff

27  RICHARD FERREIRA (hereinafter "Plaintiff") on file herein, deny, allege and aver as follows:

28

**ANSWER TO COMPLAINT FOR DAMAGES**

1

**GENERAL DENIAL**

Under the provisions of Section 431.30(d) of the California Code of Civil Procedure, Defendants deny each and every, all and singular, generally and specifically, the allegations contained in said Complaint, and further deny that Plaintiff has been damaged in any sum or sums, or at all, by reason of any act or omission of Defendants.

AS A FIRST, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that neither the Complaint nor any of the alleged causes of action therein state facts sufficient to constitute a cause of action against any of the Defendants.

AS A SECOND, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that said damages complained of, if any there were, were proximately contributed to or caused by the carelessness, negligence, fault or defects created by the remaining parties in this action, or by other persons, corporations or business entities, unknown to Defendants at this time, and were not caused in any way by Defendants, or by persons for whom Defendants are legally liable.

AS A THIRD, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that the Complaint, and each and every claim purportedly asserted therein, is barred in whole or in part by Plaintiff's failure to mitigate damages.

AS A FOURTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that the Plaintiff failed to exhaust the necessary administrative process as required by the Collective Bargaining Agreement by which Defendant CHABOT-LAS POSITAS COMMUNITY COLLEGE DISTRICT is governed. Moreover, Defendants contend that Plaintiff failed to exhaust the necessary external administrative remedies available. As such, all claims contained within Complaint are barred.

**ANSWER TO COMPLAINT FOR DAMAGES**

1    AS A FIFTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO PLAINTIFF'S

2    UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that Plaintiff failed to

3    comply with the claim provisions of the California Governmental Code with respect to the

4    timely presentation of a Governmental Claim. Further, Plaintiff's claim, if submitted, differs

5    materially from the allegations contained within the Complaint, and as such, said claims not

6    referenced in the Governmental Claim are barred.

7    AS A SIXTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO PLAINTIFF'S

8    UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that the Plaintiff failed to

9    exhaust the judicial remedies available to him, and as such, this action is barred.

10    AS A SEVENTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO

11    PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that a

12    legitimate, nondiscriminatory business reason existed for the action taken with respect to the

13    Plaintiff as identified in the Complaint.

14    AS A EIGHTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO

15    PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that any

16    recovery on the Complaint, or any cause of action purportedly alleged therein, is barred in

17    whole or in part by the after-acquired evidence doctrine.

18    AS A NINTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO

19    PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that the

20    Complaint, and each and every claim purportedly asserted therein, is barred by the

21    applicable statutes of limitations including, but not limited to, California Code of Civil

22    Procedure Section 337, 338, and 340, and California Government Code Section 12965.

23    AS A TENTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO

24    PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that the

25    Complaint, and each and every claim purportedly asserted therein, is barred in whole or in

26    part because Plaintiff's exclusive remedy for the matters alleged in the Complaint is under the

27    California Worker's Compensation Act, California Labor Code Sections 3200, et seq.

28

**ANSWER TO COMPLAINT FOR DAMAGES**

1        AS A ELEVENTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO

2   PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that the

3   Complaint, and each and every claim purportedly asserted therein, is barred in that any

4   recovery on the Complaint, or any purported cause of action alleged therein, is barred

5   because each Defendant's conduct was privileged and/or justified.

6        AS A TWELFTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO

7   PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that the

8   Complaint or any purportedly alleged claim therein, is barred in whole or in part by reason of

9   Plaintiff's unclean hands.

10       AS A THIRTEENTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO

11  PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege and aver that

12  Plaintiff failed to act to take reasonable care to avoid the harm he complains of under

13  *Faragher v. City of Boca Raton* (1998) 118 S.Ct. 1115, 140 L.Ed.2d 99.

14       AS A FOURTEENTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO

15  PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege and aver that

16  any recovery on plaintiff's complaint, or any cause of action purportedly alleged therein, is

17  barred because of plaintiff's inability to perform the essential functions of his position with

18  Defendant, even with reasonable accommodation.

19       AS A FIFTEENTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO

20  PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN Defendants allege and aver that

21  any recovery on Plaintiff's complaint, or any purportedly alleged claim therein, is barred

22  because plaintiff failed to engage in the interactive process with Defendant.

23       AS A SIXTEENTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO

24  PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege and aver that

25  any recovery on Plaintiff's complaint, or any purportedly alleged claim therein, is barred

26  because the relief sought by Plaintiff's complaint would constitute an undue burden on

27  Defendants.

28

---

**ANSWER TO COMPLAINT FOR DAMAGES**

1    AS A SEVENEENTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO
2    PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN Defendants allege and aver that
3    good faith efforts were made by Defendants to reasonably accommodate plaintiff's alleged
4    disability.

5    AS A EIGHTEENTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO
6    PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN that imposition of any punitive
7    damages against Defendants in this action would deprive Defendants of Defendants' property
8    and would constitute a criminal fine or penalty without due process of law and equal
9    protection under the California and U.S. Constitutions.

10    AS A NINETEENTH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO
11    PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege that the
12    Complaint or any purportedly alleged claim therein, fails to state facts sufficient to constitute a
13    claim for punitive damages.

14    AS A TWENTIETH, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO
15    PLAINTIFF'S UNVERIFIED COMPLAINT ON FILE HEREIN, Defendants allege and aver that
16    they are immune from the allegations and causes of action contained within the Plaintiff's
17    Complaint for damages based on the discretionary immunities provisions contained within the
18    California Government Code, including but not limited to Sections 818.8, 820.2, 820.8, 820.9,
19    821.6, 822.2 and Civil Code § 47.

20    AS A TWENTY-FIRST, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO
21    PLAINTIFF'S UNVERIFIED FIRST AMENDED COMPLAINT ON FILE HEREIN, Defendants
22    allege that there is no basis, and in fact, the Complaint fails to state sufficient facts upon
23    which to base cause of action for breach of contract or the implied covenant of good faith and
24    fair dealing, as the Plaintiff is and was a public employee at all relevant times.

25    AS A TWENTY-SECOND, SEPARATE AND DISTINCT AFFIRMATIVE DEFENSE TO
26    PLAINTIFF'S UNVERIFIED FIRST AMENDED COMPLAINT ON FILE HEREIN, Defendants
27    allege that the Complaint fails to state sufficient facts upon which to base a cause of action
28    for retaliation and/or discrimination against the individually named defendants KATHERYN

ANSWER TO COMPLAINT FOR DAMAGES

LINZMEYER; MELINDA MATSUDA; DR. ROBERT CARLSON; LORENZO LEGASPI; ANITA MORRIS; SHARON TRETHAN.

### PRAYER

WHEREFORE, Defendants pray that Plaintiff take nothing by his Complaint and that Defendants be dismissed hence with its costs of suit incurred herein and for such other and further relief as the Court deems fit and proper.


Dated: April 2008

**STUBBS & LEONE**

By: _____

LOUIS A. LEONE, ESQ.
Attorney for Defendants CHABOT-LA POSITAS COMMUNITY COLLEGE DISTRICT; KATHERYN LINZMEYER; MELINDA MATSUDA; DR. ROBERT CARLSON; LORENZO LEGASPI; ANITA MORRIS; SHARON TRETHAN

**ANSWER TO COMPLAINT FOR DAMAGES**

-6-

Re:    **Ferreira v. Chabot Las Positas Community College District, et al.**
**Alameda County Superior Court Case No.: HG 07334984**

### PROOF OF SERVICE

I, the undersigned, declare that I am employed in the City of Walnut Creek, State of California. I am over the age of 18 years and not a party to the within cause; my business address is 2175 N. California Blvd., Suite 900, Walnut Creek, California. On April 28, 2008, I served the following documents:

### ANSWER TO COMPLAINT FOR DAMAGES

on the following interested party(s) in said cause:

Richard A. Ferreira, In Pro Per
18349 Robscott Avenue
Hayward, CA 94541

**VIA MAIL - CCP §§ 1013(a), 2015.5**
[ X ]    By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and placing each for collection and mailing on that date following ordinary business practices. I am readily familiar with my firm's business practice of collection and processing of correspondence for mailing with the United States Postal Service and correspondence placed for collection and mailing would be deposited with the United States Postal Service at Walnut Creek, California, with postage thereon fully prepaid, that same day in the ordinary course of business.

[ ]    By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and depositing each envelope(s), with postage thereon fully prepaid, in the mail at Walnut Creek, California.

**VIA OVERNIGHT MAIL/COURIER VIA FEDEX- CCP §§ 1031(c), 2015.5**
[ ]    By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and placing each for collection by overnight mail service, or overnight courier service. I am readily familiar with my firm's business practice of collection and processing of correspondence/documents for overnight mail via FedEx or overnight courier service, and that it is to be delivered to an authorized courier or driver authorized by the overnight mail carrier to receive documents, with delivery fees paid or provided for, that same day, for delivery on the following business day.

**VIA FACSIMILE - CCP §§ 1013(e), CRC 2008**
[ ]    By arranging for facsimile transmission from facsimile number 925-974-8601 to the above listed facsimile number(s) prior to 5:00 p.m. I am readily familiar with my firm's business practice of collection and processing of correspondence via

facsimile transmission(s) and any such correspondence would be transmitted via facsimile to the designated numbers in the ordinary course of business. The facsimile transmission(s) was reported as complete and without error.

## VIA HAND-DELIVERY - CCP §§ 1011, 2015.5

[ X ]    By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and causing each envelope(s) to be hand-served on that day by D&T Services in the ordinary course of my firm's business practice.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on April 28, 2008, at Walnut Creek, California.

_Gloria Orason_

Gloria Orason

Re: **Ferreira v. Chabot Las Positas Community College District, et al.**
**Alameda County Superior Court Case No.:  HG 07334984**

### PROOF OF SERVICE

I, the undersigned, declare that I am employed in the City of Walnut Creek, State of California.  I am over the age of 18 years and not a party to the within cause; my business address is 2175 N. California Blvd., Suite 900, Walnut Creek, California.  On April 30, 2008, I served the following documents:

**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §1441(b) & 1441(c) [FEDERAL QUESTION]**

on the following interested party(s) in said cause:

Richard A. Ferreira, In Pro Per
18349 Robscott Avenue
Hayward, CA  94541

**VIA MAIL - CCP §§ 1013(a), 2015.5**

[ ]    By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and placing each for collection and mailing on that date following ordinary business practices.  I am readily familiar with my firm's business practice of collection and processing of correspondence for mailing with the United States Postal Service and correspondence placed for collection and mailing would be deposited with the United States Postal Service at Walnut Creek, California, with postage thereon fully prepaid, that same day in the ordinary course of business.

[ ]    By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and depositing each envelope(s), with postage thereon fully prepaid, in the mail at Walnut Creek, California.

**VIA OVERNIGHT MAIL/COURIER VIA FEDEX- CCP §§ 1031(c), 2015.5**

[ X ]    By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and placing each for collection by overnight mail service, or overnight courier service.  I am readily familiar with my firm's business practice of collection and processing of correspondence/documents for overnight mail via FedEx or overnight courier service, and that it is to be delivered to an authorized courier or driver authorized by the overnight mail carrier to receive documents, with delivery fees paid or provided for, that same day, for delivery on the following business day.

/ / /

/ / /

1

## VIA FACSIMILE - CCP §§ 1013(e), CRC 2008

2    [ ]    By arranging for facsimile transmission from facsimile number 925-974-8601 to the above listed facsimile number(s) prior to 5:00 p.m. I am readily familiar with
3    my firm's business practice of collection and processing of correspondence via facsimile transmission(s) and any such correspondence would be transmitted via
4    facsimile to the designated numbers in the ordinary course of business. The
5    facsimile transmission(s) was reported as complete and without error.

6

## VIA HAND-DELIVERY - CCP §§ 1011, 2015.5

7    [ ]    By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and causing each envelope(s) to be hand-served on that day by D&T
8    Services in the ordinary course of my firm's business practice.

9        I declare under penalty of perjury that the foregoing is true and correct and that this
10    declaration was executed on April 30, 2008, at Walnut Creek, California.

11

12

13                                    Gloria Orason

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

2